STATE OF NORTH CAROLINA v. PATRICIA WELLS JENNINGS

No. 555A90

(Filed 4 June 1993)

1. **Jury § 227 (NCI4th)— first degree murder—jury selection— views on death penalty—contradictory and equivocal responses—excusal for cause**

    The trial court did not err by excusing a prospective juror for cause in a murder prosecution where the prospective juror initially responded to both the prosecutor and the court that she did not have any moral or religious convictions against and could vote for the death penalty; she subsequently responded, upon further questioning by the prosecutor, that she would vote against the death penalty without regard to the evidence and notwithstanding the facts or circumstances; and, upon further questioning by the court, she was unable to affirmatively agree to follow the law and recommend a sentence based on the evidence and the law and felt that she would be trying to find ways to vote against the death penalty and would be predisposed or biased in some respect.

    **Am Jur 2d, Jury § 290.**

    **Comment note—beliefs regarding capital punishment as disqualifying juror in capital case-post-Witherspoon cases. 39 ALR3d 550.**

2. **Evidence and Witnesses § 2264 (NCI4th)— first degree murder—torture—opinion of pathologist**

    The trial court did not err in a first degree murder prosecution by admitting the opinion of the forensic pathologist who performed the autopsy that the victim had been tortured. The witness did not testify that defendant tortured the victim; he gave his expert medical opinion about the pattern and types of injuries he observed during the autopsy. The challenged testimony summarized the pattern of injuries and constituted a medical conclusion which the witness was fully qualified to reach. To the extent that the witness also addressed a legal conclusion or standard, the term "torture" is not a legal term of art which carries a specific meaning not readily apparent to the witness.

    **Am Jur 2d, Expert and Opinion Evidence § 244.**

STATE v. JENNINGS

[333 N.C. 579 (1993)]

3. **Evidence and Witnesses § 2264 (NCI4th)— first degree murder— sexual assault upon victim—opinion of pathologist**

The trial court did not err in a murder prosecution by allowing the forensic pathologist who performed the autopsy to testify that there had been a sexual assault upon the victim. The challenged testimony relates back to a pattern of injuries about which the pathologist had testified and constitutes a medical conclusion which he was fully qualified to render. The witness used the term "sexual assault, attack" merely to describe the pattern of injuries and, to the extent that he stated a conclusion, "sexual assault or attack" is not a legal term of art which carries a specific meaning not readily apparent to the witness.

**Am Jur 2d, Expert and Opinion Evidence § 244.**

4. **Evidence and Witnesses § 3106 (NCI4th)— first degree murder—corroboration—new evidence—no error**

The trial court did not err in a murder prosecution by allowing an emergency room nurse, a medical examiner, and a police detective to testify about statements made to them by three prior witnesses. Although defendant argues that the testimony contained entirely new evidence, the challenged testimony was properly admitted because it tended to strengthen and add weight to the original witness and the testimony was not contradictory.

**Am Jur 2d, Witnesses §§ 1001 et seq.**

5. **Evidence and Witnesses § 1081 (NCI4th)— murder—right to remain silent—evidence that right exercised—invited error**

Any error in a murder prosecution in the admission of testimony from an officer that defendant had exercised her right to remain silent was invited by defendant where the challenged testimony was elicited by the defense counsel, not the prosecutor, the defense counsel did not object or make a motion to strike, and, although defense counsel innocently broached the subject by asking whether defendant had reviewed her typewritten statement, he persistently continued along that path, repeatedly asking the agent to explain his answers.

**Am Jur 2d, Evidence §§ 638 et seq.; Homicide § 339.**

STATE v. JENNINGS

[333 N.C. 579 (1993)]

**Failure to object to improper questions or comments as to defendant's pretrial silence or failure to testify as constituting waiver of right to complain of error-modern cases. 32 ALR4th 774.**

6. **Evidence and Witnesses § 1081 (NCI4th) — murder — testimony that defendant refused to allow search — harmless error**

Testimony in a murder prosecution that defendant refused to allow a search of her hotel room and car was harmless error where defendant argued that the evidence attacked her credibility, implied her guilt, and denied her a fair trial, but there was other testimony which suggested that defendant was not trying to hide anything, defendant did not unequivocally refuse the search, and the challenged testimony was but a tiny fraction of the State's overall case.

**Am Jur 2d, Evidence §§ 638 et seq.; Homicide § 339.**

7. **Evidence and Witnesses § 736 (NCI4th) — murder — statement by magistrate when issuing search warrant — no prejudice**

Assuming error in a murder prosecution in admitting testimony that the magistrate, when issuing a search warrant, asked if the officer wanted a warrant for murder, the Supreme Court was not convinced that the jury would probably have reached a different verdict absent the error.

**Am Jur 2d, Appeal and Error §§ 797 et seq.**

8. **Evidence and Witnesses § 2068 (NCI4th) — murder — testimony disparaging defendant's character — emotions toward victim — admissible**

The trial court did not err in a murder prosecution by allowing the victim's financial advisor to testify that defendant had wanted part of the victim's (her husband's) assets transferred to her immediately, that defendant had talked of the victim as if he was not human, that there was no compassion for the victim, and that the victim's face turned white. The witness's "opinions or inferences" as to the emotions displayed by defendant toward her husband, and her husband's responses, manifested by a change in his physical aspect, were rationally based on the witness's perceptions and were helpful to a clear understanding of his testimony or the determination of a fact in issue. N.C.G.S. § 8C-1, Rule 701.

STATE v. JENNINGS

[333 N.C. 579 (1993)]

Am Jur 2d, Evidence §§ 336 et seq.; Expert and Opinion Evidence §§ 359 et seq.

Opinion evidence as to character of accused under Rule 405(a) of Federal Rules of Evidence. 64 ALR Fed. 244.

9. **Evidence and Witnesses § 2786 (NCI4th)— murder—direct examination—assumption of facts not in evidence—no error**

The trial court did not err in a murder prosecution by allowing the prosecutor to ask a pathologist whether three wounds on the victim's body could have been caused by a sharp object such as a hypodermic needle being moved around and rotated. Although defendant argued that this question assumed facts not in evidence, there had been prior testimony that a hypodermic needle was found inside defendant's cosmetic bag.

Am Jur 2d, Witnesses § 750.

10. **Evidence and Witnesses § 2797 (NCI4th)— murder—cross-examination—allegedly impertinent and insulting—no error**

There was no error in a murder prosecution where defendant contended that the prosecutor continually interrupted her during cross-examination and attempted to humiliate her by asking impertinent and insulting questions. Counsel generally have wide latitude on cross-examination to test matters related by the witness on direct examination, subject to the discretion of the trial court and the requirement that the questions be asked in good faith. While the record discloses a vigorous cross-examination, it does not disclose that the prosecutor asked the questions in bad faith.

Am Jur 2d, Witnesses §§ 743, 744, 852.

Privilege of witnesses to refuse to give answers tending to disgrace or degrade him or his family. 88 ALR3d 304.

11. **Evidence and Witnesses § 788 (NCI4th)— murder—testimony of paramedic concerning deceased—lack of medical qualifications—other testimony from medical examiner**

There was no prejudice in a murder prosecution in allowing a paramedic to testify that the deceased had been in cardiac arrest for more than 15 minutes when he arrived at the scene, even though defendant contended that the witness was not medically qualified to give this opinion, in light of the

similar, more damning testimony given by the county medical examiner and the pathologist who performed the autopsy.

**Am Jur 2d, Appeal and Error § 806.**

12. **Evidence and Witnesses §§ 781, 264 (NCI4th) — murder — character of victim — admissible in rebuttal — similar evidence admitted without objection**

There was no prejudicial error in a murder prosecution in the admission of testimony about the victim's good character where some of the evidence was properly admitted under N.C.G.S. § 8C-1, Rule 404(a) to rebut prior evidence elicited by defendant upon cross-examination that the victim suffered from dementia and that he displayed behavior characteristic of dementia. As to the general good character evidence, similar evidence was admitted without objection.

**Am Jur 2d, Appeal and Error § 806; Evidence §§ 339 et seq.**

13. **Evidence and Witnesses § 2633 (NCI4th) — murder — conversation between defendant and a judge — not privileged**

There was no error in a murder prosecution where the prosecutor was allowed to question both the defendant and a judge, who had known the victim for thirty years, about a conversation in which defendant asked the judge how closely doctors performing an autopsy could come in determining how long a person had been dead. The record establishes that the judge was actively serving when the communication in question was made, so that he was prohibited from practicing law, and defendant could not establish an attorney-client relationship.

**Am Jur 2d, Witnesses § 386.**

14. **Criminal Law § 720 (NCI4th) — murder — three lines omitted from Pattern Jury Instruction — subsequently corrected — harmless error**

There was harmless error in a first degree murder prosecution in the omission from the jury charge of one of the five essential elements of first degree murder and in giving the definition of deliberation under the heading of premeditation where the court immediately discovered its error, promptly and expressly retracted it, recharged the jury on all five elements of first degree murder, and subsequently restated all five elements when the jury requested clarification. Fur-

thermore, the jurors requested a reinstruction on the five points and specifically mentioned premeditation and deliberation; it appears clear that the correct rule was fixed in the minds of the jurors.

**Am Jur 2d, Appeal and Error § 817; Trial §§ 1478-1481.**

15. **Homicide § 480 (NCI4th) — murder — instructions — use of deadly weapon — cowboy boots**

The trial court did not err in a murder prosecution by giving a deadly weapon instruction to the jury where the evidence was that defendant had kicked or stomped the victim in the abdomen while wearing cowboy boots. Any article, instrument or substance likely to produce death or great bodily harm is a deadly weapon; thus, cowboy boots may be a deadly weapon when worn to kick or stomp an elderly man.

**Am Jur 2d, Homicide § 506.**

**Kicking as aggravated assault or assault with dangerous or deadly weapon. 33 ALR3d 922.**

16. **Criminal Law § 1339 (NCI4th) — murder — aggravating circumstance — commission of sex offense — no error**

There was no plain error in a murder prosecution where the court submitted the aggravating circumstance that the murder was committed while defendant was engaged in the commission of or while attempting to penetrate the anus with an object. Although defendant contended that the court failed to allege the aggravating circumstance in the statutory language of N.C.G.S. § 15A-2000(e)(5) or that the court omitted a necessary element of the crime of sexual offense in not using the phrase "by force and against the will of the deceased," defendant concedes that the court properly instructed the jury orally and the trial court has never been required to duplicate the exact statutory language of N.C.G.S. § 15A-2000(e) on the written list of Issues and Recommendations furnished to the jury. The trial court augmented the written instruction by twice instructing the jury on the form, at which they were looking. The additional or alternative written instructions suggested by defendant would have had no probable effect on the jury's response and thus the incomplete written issues sheet did not constitute plain error. Moreover, the evidence presented no issue as to defendant's use of force or the victim's lack

STATE v. JENNINGS

[333 N.C. 579 (1993)]

of consent, but called for a determination of the credibility of the State's witnesses versus defendant's witnesses. The jury's finding, even as worded on the written list of Issues and Recommendations, shows that it did not believe the defendant.

Am Jur 2d, Criminal Law §§ 598, 599.

17. **Criminal Law § 1341 (NCI4th)— murder—aggravating circumstance—pecuniary gain**

The trial court did not err in a prosecution for the murder of a husband by a wife by instructing the jury on the aggravating circumstance of pecuniary gain. Although defendant contended that the phrase "stood to benefit" sweeps too broadly in that it directs the jury to find this aggravating circumstance on the mere fact that defendant would benefit financially from the death of her husband, even though incidental financial gain will accrue to the surviving spouse of virtually every marriage, the phrase is not overbroad when viewed in the context of the instructions as a whole. Moreover, there was substantial evidence that the murder was committed for pecuniary gain.

Am Jur 2d, Criminal Law §§ 598, 599.

**Sufficiency of evidence, for purposes of death penalty, to establish statutory circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like-post-Gregg cases. 66 ALR4th 417.**

18. **Criminal Law § 1348 (NCI4th)— murder—mitigating circumstances—instruction on sympathy or mercy refused—no error**

The trial court did not err in a first degree murder prosecution by denying defendant's request that it instruct the jury that "you are entitled to base your verdict upon any sympathy or mercy you may have for the defendant that arises from the evidence presented in this case." The trial court submitted the statutory catch-all mitigating circumstance, N.C.G.S. § 15A-2000(f)(9), with the instructions recommended in *State v. Hill*, 331 N.C. 387.

Am Jur 2d, Criminal Law §§ 598-600.

STATE v. JENNINGS

[333 N.C. 579 (1993)]

Instructions to jury: Sympathy to accused as appropriate factor in jury consideration. 72 ALR3d 842.

19. Criminal Law § 1320 (NCI4th) — murder — sentencing phase — evidence from guilt phase — victim's character

The trial court did not err in the sentencing phase of a murder prosecution when it allowed consideration of evidence of the victim's good character introduced during the guilt phase or when it instructed the jury that it could consider all evidence heard at both the guilt and penalty phases. The character evidence was admissible and, pursuant to N.C.G.S. § 15A-2000(a)(3), competent for consideration by the jury during the penalty phase. The instruction that the jury could consider all evidence introduced at both phases was appropriate.

Am Jur 2d, Trial § 1441.

20. Criminal Law § 1344 (NCI4th) — murder — aggravating circumstances — especially heinous, atrocious, cruel — torture

The trial court did not err in a murder prosecution by submitting the aggravating circumstance that the murder was especially heinous, atrocious, or cruel where defendant was convicted on the basis of torture and premeditation and deliberation and the evidence supported both theories.

Am Jur 2d, Criminal Law §§ 598, 599.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like — post-Gregg cases. 63 ALR4th 478.

21. Criminal Law §§ 1345, 1339 (NCI4th) — murder — aggravating circumstances — especially heinous, atrocious, cruel — sex offense — not based on same evidence

The trial court did not err in a murder prosecution by submitting the aggravating circumstances that the murder was especially heinous, atrocious, or cruel and that it was committed during a sex offense based on the same evidence where there was substantial evidence of the especially heinous, atrocious, or cruel nature of the killing apart from the evidence as to whether the murder was committed while attempting the penetration of the victim's anus with an object. While the trial court should have instructed the jury that it could

not use the same evidence as the basis for finding both circumstances, defendant did not object to the failure to do so and there was no plain error. N.C.G.S. § 15A-2000(e)(5); N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law § 598.**

22. **Homicide § 487 (NCI4th) — first degree murder — torture — premeditation and deliberation — instructions**

The trial court did not err in a murder prosecution by instructing jurors that premeditation, deliberation, and intent to kill are not essential elements of first degree murder on the basis of torture.

**Am Jur 2d, Homicide § 263.**

**Sufficiency of evidence, for purposes of death penalty to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like — post-Gregg cases. 63 ALR4th 478.**

23. **Criminal Law § 1323 (NCI4th) — murder — sentencing — weighing of mitigating and aggravating circumstances**

The trial court did not err in a murder prosecution by directing the jury on Issue II to continue to Issue IV if the mitigating circumstances are of equal value and weight to the aggravating circumstances.

**Am Jur 2d, Criminal Law § 578; Trial § 841.**

24. **Constitutional Law § 370 (NCI4th) — murder — sentencing — aggravating circumstances — especially heinous, atrocious, or cruel**

The aggravating circumstance that a murder was especially heinous, atrocious or cruel was not unconstitutionally vague and overbroad as applied in North Carolina and in this case.

**Am Jur 2d, Constitutional Law § 818; Criminal Law §§ 17, 598.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances. 111 L. Ed. 2d 947.**

**25. Constitutional Law § 370 (NCI4th)— death penalty— constitutional**

The North Carolina death penalty statute is not unconstitutionally vague and overbroad, has not been imposed in a discretionary and discriminatory manner, and has not been imposed or withheld on the basis of arbitrary and capricious factors and in individual cases without proper guidance.

**Am Jur 2d, Criminal Law §§ 625 et seq.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**26. Criminal Law § 1326 (NCI4th)— murder—sentencing— mitigating circumstances—burden of proof**

The trial court did not err in a murder prosecution by instructing the jury that defendant had the burden of proving mitigating circumstances by a preponderance of the evidence.

**Am Jur 2d, Trial § 1291.**

**27. Criminal Law § 1333 (NCI4th)— murder—aggravating circumstances—no bill of particulars**

There was no error in a murder prosecution in the denial of defendant's motion for a bill of particulars from the State disclosing the statutory aggravating circumstances relied upon in seeking the death penalty.

**Am Jur 2d, Pleading §§ 297, 298.**

**28. Criminal Law § 1373 (NCI4th)— murder—death penalty—not disproportionate**

A sentence of death in a murder prosecution was not disproportionate or excessive where the record supports the jury's finding of the three aggravating circumstances submitted to it, nothing in the record suggests that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and the case involved the murder of a frail and elderly husband by his healthy and much younger wife of less than three years; the murder was preceded by a period of physical and verbal abuse, during which defendant depleted her husband's financial resources; the final assault was prolonged and vicious; and defendant never exhibited any remorse for the crime or pity for her victim. The extent of

the brutality precludes the conclusion that the death sentence was excessive or disproportionate, considering both the crime and the defendant.

**Am Jur 2d, Criminal Law §§ 609, 628.**

Justice FRYE concurring in guilt-innocence phase and dissenting in sentencing phase.

Chief Justice EXUM joins in this concurring and dissenting opinion.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Butterfield, J., at the 8 October 1990 Criminal Session of Superior Court, Wilson County, upon a jury verdict finding defendant guilty of first-degree murder. Execution stayed 26 November 1990 pending defendant's appeal. Heard in the Supreme Court 13 February 1992.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten, Assistant Attorney General, for the State.*

*James R. Parish for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally on an indictment charging her with the first-degree murder of her eighty-year-old husband, William Henry Jennings (hereinafter "Jennings"). The jury returned a verdict finding defendant guilty upon the theories of (1) premeditation and deliberation and (2) torture. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death. For the reasons discussed herein, we conclude that the jury selection, guilt and sentencing phases of defendant's trial were free from prejudicial error, and that the sentence of death is not disproportionate.

The State presented evidence that Jennings was beaten and tortured to death in a hotel room in Wilson, North Carolina on 19 September 1989. Defendant's evidence suggested that Jennings suffered from dementia and died from accidental or self-inflicted wounds.

Defendant was a nurse working at Westwood Manor Nursing Home in Wilson when she first met Jennings in June 1983. Jennings,

a retired businessman living in Wilson, was an active member of Alcoholics Anonymous and was called to the nursing home for a consultation about an alcoholic patient. Four years later, in February 1987, defendant and Jennings were married. She was forty-four years old; he was seventy-seven.

Shortly after their marriage in September 1987, defendant and Jennings visited George Henry, a financial consultant at Merrill Lynch and an acquaintance of Jennings for more than twenty years. The purpose, Henry testified, was to transfer half of Jennings' assets, which then totaled about $150,000, to defendant. An account was opened for defendant, and half of Jennings' assets were transferred to the new account.

The State presented several witnesses who testified that Jennings told them of ongoing abuse by defendant and that he was afraid defendant would kill him or have him committed to an institution. Among these was Superior Court Judge Knox Jenkins. In May 1989, Jenkins was practicing law in Smithfield. Jennings came to Jenkins' office to have a will drawn. According to Jenkins' testimony, Jennings said defendant had physically beaten him, dragged him across the room, and stomped him with her cowboy boots. Jennings told Jenkins defendant had threatened to stomp him to death with her cowboy boots. Jennings also told Jenkins defendant had tried to have him committed. Jenkins testified that Jennings was a frail man physically but was not confused and appeared well oriented. Jenkins had no reservations or doubts about Jennings' competency. Jennings never returned to Jenkins' office to sign the legal documents.

On 19 September 1989, defendant and Jennings were staying at the Hampton Inn in Wilson. About 9:30 p.m., defendant called the desk and said she had a "code blue." The hotel manager called 911, and emergency medical personnel arrived at 9:35 p.m. They found defendant performing CPR on Jennings, who was lying nude on the floor. Paramedic Larry Parnell testified that he asked defendant how long Jennings had been "down." Defendant, Parnell testified, said Jennings had been down five to ten minutes. When Parnell began doing CPR on Jennings, Jennings' skin appeared cool and his body seemed generally stiff. Paramedic Lee Fowler testified that when he arrived at the hotel room, defendant was wearing a black nightgown and brown cowboy boots.

STATE v. JENNINGS

[333 N.C. 579 (1993)]

Jennings was taken to Wilson Memorial Hospital where he was pronounced dead. Emergency room physician Dr. Andrew Duerr testified that in his opinion Jennings had been dead for at least several hours.

Dr. Andrew Price, a Wilson physician and local medical examiner, testified that he examined Jennings' body at the hospital around 10:30 the night of Jennings' death. In his opinion, based in part on the fact that Jennings' body temperature was 86.3 degrees, Jennings had been dead for six to eight hours.

Dr. Page Hudson, forensic pathologist and former Chief Medical Examiner for the State of North Carolina, testified that he performed an autopsy on Jennings on 20 September 1989. Dr. Hudson found multiple bruises and scrapes on various parts of Jennings' head, scalp, face, neck, legs, arms and hands. All the injuries appeared fresh. There was a large bruise in the mesentery of the abdominal cavity, the tissue which holds in and supports the intestines and contains blood vessels to the intestines. Dr. Hudson opined that a blunt force impact to the abdominal wall caused the tears in the mesentery, and that blood loss from these tears caused the victim's death. The injury to the abdomen was not consistent with a fall in the bathtub, Dr. Hudson testified, unless the victim fell from a height of at least twenty feet. The injury was, however, consistent with a kick or stomp to the abdomen.

Additionally, Dr. Hudson found tiny cracks or splits in the thin membrane that lines the anus around the sphincter. The surface of the membrane had been stretched to the point that it cracked. Dr. Hudson testified, further, that the pattern of injuries was not consistent with an injury caused by a rectal thermometer. Dr. Hudson also found injuries to the head of the penis in the form of sharply defined imprints. In his opinion, a pair of forceps found in the hotel room could have caused these wounds. Dr. Hudson examined the forceps and found a small piece of skin consistent with the type found on the underside of the eyelid or the head of the penis. Dr. Hudson also found a laceration on the shaft of the penis, scrapes at the base of the penis, and a scratch on the scrotum. In his opinion, most of Jennings' injuries were inflicted around the same time, and Jennings had been dead five to ten hours before his body arrived at the emergency room. Based on Jennings' injuries, Dr. Hudson opined that Jennings had been sexually assaulted and tortured.

STATE v. JENNINGS

[333 N.C. 579 (1993)]

Finally, Dr. Hudson testified that, after consultation with a neuropathologist, he found no evidence of any organic brain disorder, including Alzheimer's disease. Dr. Hudson also testified that deprivation of caring interaction can have a great effect on the personality of elderly people and can lead to mental alterations, confusion, and what appears to be dementia.[1]

Dr. Price, the local medical examiner, testified for the State on rebuttal that certain drugs can cause symptoms similar to those displayed by some persons with dementia. Tests showed high levels of one of these drugs, butalbital, in Jennings' body.

Detective Teresa Jo Adams of the Wilson Police Department investigated Jennings' death. She testified that she found a large bloodstain on the carpet of the hotel room, blood on the sheets, and a blood-stained adult's diaper[2] underneath a pillow. There was also a bloodstain on the underside of a pillowcase.

District Court Judge Allen Harrell, who had known Jennings for about thirty years, testified for the State on rebuttal that defendant called him the day after Jennings' death and asked how closely doctors could approximate the time of a person's death based on autopsy results.

Four expert witnesses testified for defendant that Jennings suffered from dementia. Two, family practitioner Dr. Donald Reece and neurologist Dr. Ashley Kent, examined Jennings prior to his death. Both opined, based on their examinations, that Jennings suffered from dementia. Two others, psychiatrist and attorney Dr. Thomas W. Brown and psychologist John F. Warren III, reviewed Jennings' medical records and concurred with Drs. Reece and Kent that Jennings suffered from dementia. Dr. Brown testified that this was a "clear case of dementia" and that it is not uncommon for demented patients to injure themselves. After reviewing photographs of Jennings' injuries, Dr. Brown testified that, in his opinion, all the injuries could have been self-inflicted.

---

1. Dementia is an organic mental disorder due to any one of a number of conditions. It is marked by loss of intellectual capabilities, impairment of memory, faulty judgment, changes in personality, etc. 1 *Schmidt's Attorneys' Dictionary of Medicine* D-37 (1991).

2. Defendant testified that Jennings wore diapers to help his "problem," presumably incontinence.

Defendant testified in her own behalf. She said she loved her husband and did not kick, stomp, assault or hurt him in any way. Defendant testified that Jennings would get very depressed at times and would beat his testicles and pick his rectum. During these severe depressions he would "go into what I call, canine behavior . . . . [H]e would crawl around on the floor and make noises like a dog and would want to eat—he would put his food down on the floor and want to eat that way." On the day before his death, Jennings found out that a friend had died; this caused him to retreat into his "canine behavior." Defendant testified that Jennings beat his testicles with a shoe and, later that day, fell in the bathtub.

Defendant testified that the next day, 19 September, Jennings again fell hard in the bathtub. She also found him in the bathroom beating himself with a "huge piece of cheese that we'd been carrying around for a couple of weeks, and it was hard . . . . He had [the cheese] in [a] plastic bag, swinging and hitting himself with it." She also testified she saw Jennings picking his rectum. Later that evening she awoke and found him on the floor. She did not recall telling paramedic Parnell that Jennings had been down five to ten minutes; she did not recall asking Judge Harrell how closely doctors can estimate the time of death from autopsy results; and she denied that she was wearing cowboy boots when paramedics came to the hotel room the night of Jennings' death.

Defendant moved to dismiss at the close of the State's evidence and of all the evidence. The trial court denied the motions. The jury found defendant guilty of first-degree murder based on both torture and premeditation and deliberation.

At the capital sentencing hearing, Dr. Hudson, forensic pathologist and medical examiner, again testified for the State about the nature and extent of Jennings' injuries. George Henry, Merrill Lynch financial manager, testified again about the extent of Jennings' holdings, the transfers during the course of Jennings' marriage to defendant, and the value of the limited partnerships still in Jennings' account at the time of the trial. Henry also testified that defendant had visited him in October 1989 to talk about Jennings' intent to transfer the partnerships to her accounts, as evidenced by three letters sent more than a year before to Merrill Lynch. Defendant's daughter and son testified about their mother's qualities and achievements.

The jury found three aggravating circumstances—that the murder was committed while the defendant was engaged in the commission of or while attempting the penetration of the anus with an object, that the murder was committed for pecuniary gain, and that the murder was especially heinous, atrocious, or cruel. The jury found four mitigating circumstances—that defendant has no record of criminal convictions, has been a peaceful person in the community in which she lives and has no prior record for violent crimes, and that her childhood history, background and record show no indication of a habitually violent nature.

Upon finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, and that the aggravating circumstances were sufficiently substantial to call for the death penalty, the jury recommended a sentence of death.

JURY SELECTION ISSUE

[1] Defendant first contends that the trial court erred in excusing a prospective juror for cause because of her views about the death penalty, thereby depriving defendant of her rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, sections 19 and 27 of the North Carolina Constitution. Defendant contends that the prospective juror only voiced general objections to the death penalty, or only expressed conscientious or religious scruples against its infliction. We disagree.

The test for determining whether a prospective juror may be properly excused for cause for his views on the death penalty is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985); *accord, e.g., State v. Davis*, 325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990). However, a prospective juror's bias may not always be "provable with unmistakable clarity [and,] [i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *Davis*, 325 N.C. at 624, 386 S.E.2d at 426. "[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to ar-

STATE v. JENNINGS

[333 N.C. 579 (1993)]

ticulate . . . their true feelings." *Wainwright*, 469 U.S. at 425-26, 83 L. Ed. 2d at 852.

Prospective juror Lamm was excused for cause on the motion of the prosecutor only after extensive questioning by the prosecutor, defense counsel, and the court. Pertinent questions and answers follow:

[PROSECUTOR]: [C]ould you return a sentence recommendation of death?

[JUROR LAMM]: I'd rather not.

[PROSECUTOR]: Are you saying then that you would automatically vote against imposing capital punishment without regard to the evidence as it develops?

[JUROR LAMM]: Yes, sir.

[PROSECUTOR]: I take it then you would not vote in favor of the death penalty under any facts or circumstances no matter how aggravating the case was and no matter what the facts were.

[JUROR LAMM]: I wouldn't like to vote death.

[PROSECUTOR]: Are you saying then that you would not vote for death, no matter how aggravating the case was or how or what the facts were, you could not return a sentence recommendation of death?

[JUROR LAMM]: No.

[PROSECUTOR]: If that's your conviction, I'm not trying to change that, I'm just asking you?

[JUROR LAMM]: Well, I wouldn't like to, no.

[PROSECUTOR]: You would not, are you saying that you would not be able to?

[JUROR LAMM]: No.

[PROSECUTOR]: Challenged for cause.

. . . .

THE COURT: . . . [D]o you feel that some persons convicted of first degree murder deserve the death penalty?

STATE v. JENNINGS

[333 N.C. 579 (1993)]

[JUROR LAMM]: Yes, if they did it.

THE COURT: Do you feel that there are some persons who are guilty of first degree murder who do not deserve the death penalty?

[JUROR LAMM]: (Pause) Well, yes.

. . . .

THE COURT: . . . [The] Legislature has set out very strict procedures that the jury must follow. . . . [W]ould you be willing to go through those procedures?

[JUROR LAMM]: Yes, sir.

THE COURT: And if you went through those procedures and if you were satisfied that death was the appropriate sentencing in the case, could you vote death, walk back into this Courtroom and announce your verdict?

[JUROR LAMM]: Yes, if I had to.

THE COURT: Do you feel that you would find yourself in a situation whereby you would be trying to find ways that you could not vote for the death penalty?

[JUROR LAMM]: I do feel like that.

THE COURT: That you would be trying to find ways to vote for life imprisonment over death?

[JUROR LAMM]: Yes.

. . . .

THE COURT: Alright, let me sum it up. Do you feel that if you served on this jury and if the trial got to the sentencing phase that you could listen to the evidence and could make your recommendation to me and it would be more than a recommendation, it would really be a sentence. I would simply put it into effect based on what the jury recommended to the Court. . . . [D]o you feel that you could recommend a sentence to the Court based on the evidence you heard and based on the law and that you would not be predisposed one way or the other in your deliberation? Or do you feel that you would be biased in some respect?

[JUROR LAMM]: Probably would.

THE COURT: Probably would what?

[JUROR LAMM]: Be biased in some way.

Lamm's contradictory and sometimes equivocal responses illustrate that "determinations of juror bias cannot always be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 852. Lamm initially responded to both the prosecutor and the court that she did not have any moral or religious convictions against and could vote for the death penalty. However, she subsequently responded, upon further questioning by the prosecutor, that she would vote against the death penalty without regard to the evidence and notwithstanding the facts or circumstances. *See, e.g., State v. Quick*, 329 N.C. 1, 14, 405 S.E.2d 179, 187 (1991) (prospective juror who stated she could not consider the death penalty no matter how aggravated the case and regardless of the facts properly excused for cause). Upon further questioning by the court, Lamm was unable to affirmatively agree to follow the law and recommend a sentence based on the evidence and the law; rather, she felt that she would be trying to find ways she could vote against the death penalty and would be predisposed or biased in some respect. "A challenge for cause . . . may be made by any party on the ground that the juror . . . [a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." N.C.G.S. § 15A-1212(8) (1988). Therefore, the trial court did not err in excusing prospective juror Lamm for cause. This assignment of error is overruled.

## GUILT PHASE ISSUES

[2] Defendant next contends the trial court erred in allowing Dr. Hudson, forensic pathologist and former Chief Medical Examiner who performed the autopsy, to testify that, in his opinion, Jennings was "tortured." Defendant argues that because she was charged with first-degree murder on the basis of torture, it was error to admit the testimony because it constituted a relevant legal conclusion or standard. We find no error.

North Carolina Rule of Evidence 704 provides that "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704 (1992). Under Rules 701 and 702, opinions

must be helpful to the trier of fact. N.C.G.S. § 8C-1, Rules 701 and 702 (1992). Expert testimony as to a legal conclusion or standard is inadmissible, however, at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the expert witness. *State v. Rose*, 323 N.C. 455, 459, 373 S.E.2d 426, 429 (1988) (medical expert could not testify that a defendant did or did not "premeditate and deliberate"; testimony embraced precise legal terms, definitions of which are not readily apparent to medical experts); *State v. Weeks*, 322 N.C. 152, 165-67, 367 S.E.2d 895, 903-04 (1988) (trial court did not err by refusing to admit testimony of medical experts that the defendant did not act in a "cool state of blood"; testimony embraced precise legal terms, definitions of which are not readily apparent to medical experts); *State v. Ledford*, 315 N.C. 599, 617-21, 340 S.E.2d 309, 320-22 (1986) (medical expert could not testify that injuries were the "proximate cause" of death); *State v. Smith*, 315 N.C. 76, 100, 337 S.E.2d 833, 849 (1985) (medical witness could testify that injuries were caused by a male sex organ, an ultimate issue; witness "did not testify that [victim] had been raped, nor that the defendant raped her"). *Cf. State v. Crawford*, 329 N.C. 466, 478, 406 S.E.2d 579, 585-86 (1991) (medical expert could testify that a child had been "threatened" and "coerced" and would not "voluntarily" have drunk large quantities of water; these terms "have no specific technical legal meaning as they were used here and are not 'words of art.' "); *State v. Saunders*, 317 N.C. 308, 314, 345 S.E.2d 212, 216 (1986) (trial court did not err by allowing pathologist to testify that the victim's wound was not a self-defense-type wound; although an ultimate issue, pathologist clearly in a position to assist jury in understanding nature of victim's wounds and in determining whether defendant acted in self-defense).

Dr. Hudson was tendered by the State and accepted without objection as an expert in the field of forensic pathology. During redirect examination, the following exchange took place:

[PROSECUTOR]: Dr. Hudson, are you familiar with the term torturous type injury?

[DEFENSE COUNSEL]: Objection.

. . . .

[PROSECUTOR]: Dr. Hudson, considering all of the injuries that you observed on the body of William Henry Jennings, do you

have an opinion as to whether or not Mr. Jennings had been the victim of torturous activity?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[DR. HUDSON]: I do.

[PROSECUTOR]: What is your opinion?

[DR. HUDSON]: In my opinion, he had been tortured.

Dr. Hudson did not testify that, in his opinion, defendant tortured Jennings; he gave his expert medical opinion about the pattern and types of injuries he observed during the autopsy. Dr. Hudson had previously testified, *inter alia*, that the bruises to the head, chest, and abdomen were caused by a blunt force, and that the blow to the head may have stunned Jennings. The blood loss occasioned by the blow to the abdomen would cause considerable pain, drowsiness, eventual unconsciousness and death, if unattended. The scrapes and bruises to Jennings' legs, arms, and buttocks were not received in a fall—there were no graze wounds, skid type marks, concrete or gravel burns. Dr. Hudson testified that in his opinion most of the wounds were fresh, recent, suffered "pretty close to time of death," and not self-inflicted. Finally, the amount of mucus collected in the lower part of Jennings' bronchial tubes was "common in persons who die slowly of multiple injuries." The challenged testimony summarized this pattern of injuries and constituted a medical conclusion which Dr. Hudson, forensic pathologist and Chief Medical Examiner, was fully qualified to reach.

However, to the extent that Dr. Hudson also addressed a legal conclusion or standard, the term "torture" is not a legal term of art which carries a specific meaning not readily apparent to the witness. "Torture" does not denote a criminal offense in North Carolina and therefore does not carry a precise legal definition, as "murder" and "rape" do, involving elements of intent as well as acts. Further, the commonly understood meaning of the term is approximately the same as the instructions the trial court gave the jurors—"inflict[ion of] pain or suffering upon the victim for the purpose of satisfying some untoward propensity." *Cf. Webster's Third New International Dictionary* 2414 (1976) (torture means the "infliction of intense pain . . . to punish or coerce someone"; "torment or agony induced to give sadistic pleasure to the torturer").

**STATE v. JENNINGS**

[333 N.C. 579 (1993)]

We hold that the trial court did not err by allowing this testimony. This assignment of error is therefore overruled.

**[3]** Defendant contends that the trial court also erred in allowing Dr. Hudson to testify that there was a "sexual assault" upon the victim. Again, she argues that Dr. Hudson expressed a legal conclusion or standard. Again, we disagree.

The following exchange took place during redirect examination:

[PROSECUTOR]: Dr. Hudson, the injuries that you've described for the jury, do you have an opinion as to whether or not they would have been inflicted at different times or if they are pretty much all the same age?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[DR. HUDSON]: I do.

[PROSECUTOR]: And what is your opinion?

[DR. HUDSON]: The great bulk of the injuries in my opinion occurred about the same time. That is, they were all fairly fresh, fairly recent injuries. They were all pretty close to the time of death. The exceptions, I think, were few.

[PROSECUTOR]: [Is it] possible that these—that all of these injuries would have been sustained in a fall?

. . . .

[DR. HUDSON]: No, sir, my opinion is that these injuries were not received in a fall.

[PROSECUTOR]: Why do you say that, sir?

. . . .

[DR. HUDSON]: I've seen a wide variety of injuries in a wide variety of people over many years, and I don't recall any—any kind of fall that would even approach this pattern.

Because one has to consider not only the individual injuries in their size and shape and location but one has to consider them all together and this pattern simply does not fit with a—with a fall.

STATE v. JENNINGS

[333 N.C. 579 (1993)]

[PROSECUTOR]: What does this pattern indicate to you, sir?

. . . .

[DR. HUDSON]: In my opinion, this pattern of injuries fits with assault, attack.

[DEFENSE COUNSEL]: Move to strike.

THE COURT: Denied.

[PROSECUTOR]: What about the anal injuries, sir?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[DR. HUDSON]: I'm considering all the anal injuries and the injuries to the genital area, rather all the injuries together as part of an assault. To me there's a sexual assault as well as a generalized assault.

Dr. Hudson had previously testified that in his opinion insertion of a blunt instrument caused the injuries to Jennings' anus, and that a forceps could have caused the injury to the head of the penis. The challenged testimony relates back to this pattern of injuries and constitutes a medical conclusion Dr. Hudson was fully qualified to render. Dr. Hudson used the term "sexual assault, attack" merely to describe the pattern of injuries. Again, and to the extent that Dr. Hudson stated a legal conclusion, "sexual assault or attack" is not a legal term of art which carries a specific meaning not readily apparent to the witness. Like "torture," "sexual assault" does not carry a precise legal definition involving elements of intent as well as acts, nor does it have a legal meaning that varies from the common understanding of the term. We thus hold that the trial court did not err by allowing this testimony to assist the jury in understanding the nature of Jennings' injuries. This assignment of error is overruled.

[4]  Defendant next contends that the trial court erred by allowing into evidence otherwise non-admissible testimony under the guise of corroboration. Specifically, defendant contends that three witnesses — emergency room nurse Pearl Chandler, medical examiner Dr. Price, and Wilson police detective Adams — testified about statements made to them by three prior witnesses — paramedic Lee Fowler, nurse Frances Dineen, and Dr. Price, respectively. In each case, defendant argues, the witness' testimony contained

"entirely new evidence" and therefore was inadmissible to corroborate prior testimony. For example, nurse Chandler testified that paramedic Fowler stated, "something's not right, something's not right," as he wheeled the victim's body into the emergency room. Because Fowler, who testified prior to Chandler, did not testify that he made this statement, the trial court erred by allowing Chandler's testimony, according to defendant.

It is well settled that "[t]o be admissible as corroborative evidence, prior consistent statements must corroborate the witness' testimony, . . . but the corroborative testimony *may contain 'new or additional information when it tends to strengthen and add credibility to the testimony which it corroborates.'* " *State v. Howard*, 320 N.C. 718, 724, 360 S.E.2d 790, 794 (1987) (citation omitted) (emphasis added) (*quoting State v. Kennedy*, 320 N.C. 20, 35, 357 S.E.2d 359, 368 (1987) ); *see also State v. McDowell*, 329 N.C. 363, 384-85, 407 S.E.2d 200, 212 (1991); *State v. Coffey*, 326 N.C. 268, 293, 389 S.E.2d 48, 63 (1990); *State v. Ramey*, 318 N.C. 457, 468-70, 349 S.E.2d 566, 573-74 (1986). The State cannot, however, introduce prior statements which " 'actually directly contradict[ ] . . . sworn testimony.' " *McDowell*, 329 N.C. at 384, 407 S.E.2d at 212 (*quoting State v. Burton*, 322 N.C. 447, 451, 368 S.E.2d 630, 632 (1988) ).

We agree with the State that the challenged testimony of each of the three witnesses was properly admitted because each tended to strengthen and add weight to the original witness and the testimony was not contradictory. For example, although paramedic Fowler did not testify that he said, "something's not right, something's not right," when he entered the emergency room, he did testify that he thought there were many "unusual" circumstances about this case. Indeed, Fowler testified that he reported his observations to the "charge nurse" in the emergency room, which is required in situations where a paramedic believes something is amiss. Nurse Chandler's testimony, therefore, like that of each of the challenged witnesses, was properly admitted to corroborate testimony of a prior witness. This assignment of error is overruled.

[5] Defendant next contends the trial court erred by allowing S.B.I. Agent Tim Thayer to comment on defendant's decision after her arrest to exercise her constitutional right to remain silent. During his cross-examination of Agent Thayer, defense counsel questioned Thayer as to the procedure used in obtaining a statement from defendant *prior* to her arrest. Defendant brings to our

attention the following colloquy between defense counsel and Thayer:

[DEFENSE COUNSEL]: Was [defendant's] typewritten statement reviewed with Mrs. Jennings to determine whether or not that was exactly correct?

[AGENT THAYER]: No, [by] the time it was returned to me, she had already been placed in jail and she refused to speak further with us[;] I couldn't go over anything with her.

[DEFENSE COUNSEL]: When you say refused to speak, is that a police term for invoking her right not to make a statement?

[AGENT THAYER]: That's correct.

[DEFENSE COUNSEL]: That is, she declined to make a statement, isn't that correct?

[AGENT THAYER]: Refused is the same thing, she would not talk to us.

. . . .

[DEFENSE COUNSEL]: Did you verify the statement with her and I'm talking about the typewritten statement?

[AGENT THAYER]: As I explained to you just a minute ago, she at that point when the statement was typed, she was incarcerated and she refused to make any further statements.

[DEFENSE COUNSEL]: Or she declined to make any further statements?

[AGENT THAYER]: The same words mean the same basically.

[DEFENSE COUNSEL]: But Mr. Thayer they are your words, aren't they?

[AGENT THAYER]: Which words are those?

[DEFENSE COUNSEL]: The words reviewed, the words claimed, the words—

[AGENT THAYER]: She would not make a statement, refused, declined, she would not make a statement.

[DEFENSE COUNSEL]: Is there any law against her making a statement or not making a statement?

[AGENT THAYER]: It's her constitutional right, if you have nothing to hide, you make a statement generally.

The State responds that any error was invited by defendant, and hence she cannot complain on appeal. We agree.

The law is clear that a defendant cannot be penalized for exercising her constitutional right to remain silent. *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91 (1976); *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106 (1965); *State v. Hoyle*, 325 N.C. 232, 382 S.E.2d 752 (1989); *State v. Lane*, 301 N.C. 382, 271 S.E.2d 273 (1980); *State v. Castor*, 285 N.C. 286, 204 S.E.2d 848 (1974). In *Castor*, we held that "[a]dverse comments on a defendant's failure to testify at trial are impermissible under North Carolina law, Constitution of North Carolina, Article I, Section 23, N.C.G.S. § 8-54, and under the Fifth and Fourteenth Amendments to the Constitution of the United States." *Id.* at 291, 204 S.E.2d at 852-53.

The law is equally clear, however, that "[a] defendant is not prejudiced . . . by error resulting from his own conduct." N.C.G.S. § 15A-1443(c) (1988). *See, e.g., State v. Greene*, 324 N.C. 1, 12, 376 S.E.2d 430, 438 (1989) (defendant cannot invalidate trial by inviting error, eliciting evidence on cross-examination which he might have rightfully excluded if the same evidence had been offered by the State), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991). Unlike in *Hoyle*, *Lane* and *Castor*, the challenged testimony here was elicited by the defense counsel, not the prosecutor. Further, here, unlike in those cases, the defense counsel did not object to the testimony or make a motion to strike. Defendant thus invited any error. Although defense counsel innocently broached the subject with Agent Thayer by asking whether defendant had reviewed her typewritten statement, he persistently continued along that path, repeatedly asking Thayer to explain his answers. Defendant cannot now complain about this evidence which she solicited. This assignment of error is overruled.

[6] Defendant next argues the trial court erred by allowing two police officers to testify that defendant refused to allow a search of her hotel room and car. The officers subsequently obtained a search warrant. Defendant argues that she should not be penalized for exercising her constitutional right to refuse a warrantless search. The State, at oral argument, candidly acknowledged that it was "not proper to allow this sort of evidence as evidence of guilt,"

STATE v. JENNINGS

[333 N.C. 579 (1993)]

drawing our attention to *United States v. Prescott*, 581 F.2d 1343 (9th Cir. 1978). In *Prescott*, the court, referring to the Fourth Amendment, stated that "[o]ne cannot be penalized for passively asserting this right, regardless of one's motivation"; to allow otherwise would mean that "future consents [to searches] would not be 'freely and voluntarily given.'" 581 F.2d at 1351 *(quoting Bumper v. North Carolina*, 391 U.S. 543, 548, 20 L. Ed. 2d 797, 802 (1968)).

While it was error to allow this testimony as evidence of guilt, we hold the testimony harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1988). Defendant argues that this evidence attacked her credibility, implied her guilt, and denied her a fair trial. The record as a whole belies this conclusion. First, according to testimony from another police officer, defendant gave her verbal consent for Dr. Price, the medical examiner, to "go back to the motel room and look around." This suggested that defendant was not trying to hide anything from the authorities. Second, defendant did not unequivocally refuse the search. According to the testimony of both officers, defendant said she thought she should talk with Judge Harrell, a friend of hers, before giving an answer. The officers' request to search, according to testimony, came at 3:18 a.m., after defendant had given a detailed statement to police. Agent Thayer told defendant that the search was normal procedure when "we are investigating a suspicious death." Given this stressful situation, defendant's statement that she wanted to talk with someone before giving permission does not appear unreasonable; certainly, it does not seem so unreasonable as to destroy defendant's credibility in the eyes of the jury and deny her a fair trial. Finally, the challenged testimony was but a tiny fraction of the State's overall case. We hold, therefore, that any error in its admission was harmless beyond a reasonable doubt.

[7] Defendant next argues she is entitled to a new trial because, while testifying about how she obtained a search warrant, Detective Adams made the following statement:

> I asked [Magistrate] Doug Stewart to please give me a search warrant and I drew up an application for a search warrant . . . and at that time *Doug Stewart asked me if I wanted a warrant for murder, and I told him, no.*

Defendant argues that the italicized portion of the statement was inadmissible hearsay which expressed an opinion as to defendant's guilt. The State responds that the challenged statement is not

hearsay because it was not offered for the truth of the matter asserted. *See* N.C.G.S. § 8C-1, Rule 801(c) (1992). Additionally, the State contends that the fact that a magistrate issued an arrest warrant cannot be evidence of guilt because an arrest warrant is issued on a showing of mere probable cause. *See* N.C.G.S. § 15A-304(a) (1988).

Defendant failed to object to the statement and our review is therefore limited to consideration of whether its admission constituted plain error. Assuming error, *arguendo*, we are not convinced that, absent the error, the jury probably would have reached a different verdict. *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986). This assignment of error is without merit.

[8] Defendant next contends that testimony from Merrill Lynch financial advisor George Henry, who disparaged her character, was unresponsive, irrelevant, and prejudicial, contrary to Rules 404, 405 and 608 of the North Carolina Rules of Evidence. For example, in response to questioning about a meeting between defendant, Jennings and Henry, Henry testified that defendant wanted part of Jennings' assets to be transferred to her immediately. When asked what defendant said, Henry testified:

> [HENRY]: And that is, and I can't remember the words so much as it was the way the words were delivered, and she was talking to him as if he was not even a human being.
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [HENRY]: Her face, her eyes, her tone, was something like I had never seen before in my life.
>
> [DEFENSE COUNSEL]: Motion to strike.
>
> THE COURT: Denied.

Later, describing Jennings' reaction to defendant's demeanor at the meeting, Henry testified:

> Bill's face turned right white. I was shocked, it was not vulgar, it was not the loudness, I mean it was the—just absolutely no compassion whatsoever for her husband.

We hold that this and other similarly challenged testimony was admissible under Rule 701, which states:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701. For example, the state of a person's health, the emotions he displayed on a given occasion, or other aspects of his physical appearance are proper subjects for lay opinion. 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 129 at 572-76 (3d ed. 1988) [hereinafter 1 *Brandis on Evidence*]. This witness's "opinions or inferences" as to the emotions displayed by defendant toward her husband, and her husband's responses, manifested by a change in his physical aspect, were rationally based on the witness's perceptions and were helpful to a clear understanding of his testimony or the determination of a fact in issue. This assignment of error is overruled.

[9] Defendant next argues she was denied a fair trial because the prosecutor assumed facts not in evidence during his direct examination of Dr. Hudson. The prosecutor asked Dr. Hudson whether three wounds on the victim's body could have been made by a sharp object such as a hypodermic needle being moved around and rotated. Dr. Hudson, over objection, answered that they could have been. Defendant argues that this question assumed facts not in evidence. Prior to Dr. Hudson's testimony, however, Detective Adams testified that a hypodermic needle was found inside defendant's cosmetic bag at the hotel room. Defendant's argument thus is without merit.

[10] Defendant further contends that the prosecutor continually interrupted her during cross-examination and attempted to humiliate her by asking impertinent and insulting questions. The following exchange is typical:

[PROSECUTION, MR. JOSEPHS]: No grass, grit, dirt, or other debris was on the body, was it?

[DEFENDANT]: I don't know what those marks on his buttocks are. They look like gravel marks.

[PROSECUTION]: You were in Court all last week, weren't you?

[DEFENSE COUNSEL]: Objection, your Honor. We'll stipulate that we were in Court all last week and two weeks before

that, and we'll probably be here the rest of the week. Thank you.

THE COURT: Ask the next question, Mr. Josephs.

. . . .

[PROSECUTION]: Was that good grounds to abandon him and go sit in the car?

[DEFENDANT]: He wasn't abandoned. I was—

[PROSECUTION]: Did you call anybody?

. . . .

[PROSECUTION]: I'm asking you about one thing and one thing only, ma'am, the canine behavior.

[DEFENSE COUNSEL]: Objection, Your Honor. Your Honor, we object to the District Attorney directing his whatever you call it, animus or attitude at the witness. If he has any problems with the witness asking a question, we would ask the Court to instruct the witness appropriately and then let's move to the next question.

[PROSECUTION]: Your Honor, she's not answering my questions. I'm repeating the question.

THE COURT: All right. Let's take a deep breath and start over. Let me sit back down. Ask it again Mr. Josephs.

Counsel generally have wide latitude on cross-examination to test matters related by the witness on direct examination, subject to the discretion of the trial court and the requirement that the questions be asked in good faith. *See, e.g., State v. Warren*, 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990). Further, the questions asked by the State "are deemed proper unless the record discloses that the questions were asked in bad faith." *Id.; see also State v. Garner*, 330 N.C. 273, 291, 410 S.E.2d 861, 870 (1991). While the record discloses a vigorous cross-examination, it does not disclose that the prosecutor asked the questions in bad faith. We thus hold that the prosecutor's cross-examination did not deny defendant a fair trial. *Cf. State v. Britt*, 288 N.C. 699, 712-13, 220 S.E.2d 283, 292 (1975) (defendant denied a fair trial when the prosecutor placed before the jury "inadmissible and prejudicial matter," in-

cluding the fact that the defendant had received the death penalty
in a prior trial of the case). This assignment of error is overruled.

[11] Defendant next contends that the trial court erred by allow-
ing paramedic Fowler to testify that the deceased had been in
cardiac arrest for "more than fifteen minutes" when Fowler arrived
at the scene. Fowler, she argues, was not medically qualified to
give this opinion, and this evidence was prejudicial because it directly
contradicted her statement that she called the paramedics as soon
as she discovered her husband on the floor.

Assuming, without deciding, that Fowler was not qualified
to give this opinion, there is no reasonable possibility that improper
admission of the opinion could have prejudiced defendant, in light
of the similar, more damning testimony by Drs. Price and Hudson
that the deceased had been dead for five to ten hours by the
time Dr. Price examined the body at 10:30 p.m. Defendant does
not dispute that Drs. Price and Hudson, the county medical ex-
aminer and the pathologist who performed the autopsy, respective-
ly, were qualified to give this testimony or that their testimony
was properly admitted. This assignment of error is overruled.

[12] Defendant next contends the trial court erred by allowing
four witnesses to testify about Jennings' good character, contrary
to North Carolina Rule of Evidence 404(a). Specifically, defendant
complains about the following testimony: Ruthie Joan Roseboro,
a nurse from the Veteran's Administration Hospital in Fayetteville,
testified during the State's case-in-chief that she met Jennings when
he was a patient at the hospital sometime during 1989; that he
was a very nice patient, meek and humble, who did not cause
any problems, exhibit any dangerous behavior, or act like he did
not know what was going on. Garland Tucker testified during the
State's case-in-chief that he had known Jennings for fifteen or more
years, had met him at a Rotary Club meeting, saw him about
once a week during those fifteen or so years, played golf with
him once or twice a week in the spring and summer sometimes,
and hunted with him. Jennings, said Tucker, was "quite a nice
fellow," a "perfect gentleman," who spent most of his time trying
to help people, especially after he retired, working with Alcoholics
Anonymous. Judge Harrell, a district court judge, testified during
the State's rebuttal that he had known Jennings for about thirty
years, knew he had been an alcoholic before he met him, and knew
that Jennings worked with alcoholics. Dr. Price, the medical ex-

aminer, testified during the State's rebuttal that Jennings was a member of the Elks Club, was an acknowledged alcoholic who had conquered alcoholism, and was dedicated "to helping others do the same through his work on the board of directors of Flynn Home and through his counseling."

Rule 404(a) states, in pertinent part:

(a) *Character Evidence Generally*—Evidence of a person's character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

. . . .

(2) Character of victim—Evidence of a pertinent trait of character of the victim of a crime offered by an accused, or by the prosecution to rebut the same . . . .

N.C.G.S. § 8C-1, Rule 404(a) (1992). Under Rule 404(a)(2), the prosecution can introduce otherwise inadmissible evidence of a crime victim's character to rebut evidence of a pertinent trait of character offered by the defendant. *Quick*, 329 N.C. at 26, 405 S.E.2d at 194. However, the prosecution must wait until the defendant has introduced evidence before introducing evidence in rebuttal. *State v. Faison*, 330 N.C. 347, 355-56, 411 S.E.2d 143, 148 (1991).

We conclude that Nurse Roseboro's assessment of Jennings' behavior as a patient in 1989 was properly admitted under Rule 404(a)(2) to rebut prior evidence, elicited by defendant upon cross-examination of Drs. Hudson and Price, that Jennings suffered from dementia and that he displayed behavior characteristic of dementia. Both the prosecution and the defense questioned Dr. Hudson about dementia. Defendant asked Dr. Price further whether he had been told that Jennings was confused at times and would wander around naked—apparently not to impeach Dr. Price, but to introduce additional evidence that Jennings suffered from dementia and was, at times, dangerous to himself. Defendant maintained that the injuries Jennings sustained prior to death were accidental or self-inflicted.

As to the general good character evidence that Jennings was a nice old gentleman and a reformed alcoholic who helped everyone, we apply the rule of waiver and conclude that, assuming timely objections to all this evidence, defendant lost the benefit of these objections because similar evidence was theretofore and thereafter

admitted without objection. *See* 1 *Brandis on Evidence* § 30 at 144-45. Defendant herself testified that Jennings had been "a very good man" who had organized mental health programs for two counties, counseled for Alcoholics Anonymous, and served with her on the board of directors of Flynn Home. Dr. Brown, an attorney and forensic psychiatrist, testified for defendant that defendant had described Jennings as an intelligent, dedicated, loving, kind man who helped everyone. Dr. Warren, a forensic pathologist testifying for the defendant, concluded that Jennings suffered from progressive dementia, becoming at times argumentative, impulsive, incontinent, agitated and confused, dangerous to himself—especially self-mutilative—but who could have good days or even a good week when he did not show symptoms of dementia. For the foregoing reasons, this assignment of error is overruled.

[13] Defendant next contends the trial court erred by allowing the prosecutor to question both defendant and Judge Harrell about a conversation between them because that conversation was protected by the attorney-client privilege which only defendant could waive. Defendant also contends the trial court erred by refusing to allow her to testify on voir dire concerning the existence of an attorney-client relationship between herself and Judge Harrell.

Defendant was asked, over objection, whether she had asked Judge Harrell, "How close can they come in an autopsy to pinning down the time of death?" She replied that she did not remember asking this question. Judge Harrell testified for the State on rebuttal. He said he had known the deceased for close to thirty years and that he also knew defendant. Judge Harrell testified that on the day after Jennings' death, defendant telephoned him. After exchanging pleasantries, defendant told him about Jennings' death. Defendant then asked "how closely an autopsy—rather the doctors performing the autopsy, how closely they could come in determining how long a person had been dead." Judge Harrell testified that he did not give defendant legal advice: "[S]he didn't seem to be asking for legal advice, what I would have thought was medical advice of some kind."

A communication is covered by the attorney-client privilege if it has been "made in the course of seeking or giving legal advice for a proper purpose." 1 *Brandis on Evidence* § 62 at 302. The record establishes, and we can take judicial notice of the fact that, when the communication in question was made, Harrell was actively

serving as a judge of the district court for the seventh judicial district of North Carolina. He thus was prohibited by law from engaging in the private practice of law. N.C.G.S. § 84-2 (1985); *see also* N.C. Code of Judicial Conduct, Canon 5(F). Defendant thus cannot establish that she had an attorney-client relationship with Judge Harrell or that he was giving her legal advice for a proper purpose. Further, the trial court allowed extensive voir dire on the question of attorney-client privilege, during which defendant's attorneys argued that defendant believed the attorney-client relationship existed, and otherwise made and preserved objections on behalf of defendant. Notwithstanding the absence of defendant's testimony that she reasonably believed she was dealing with an "attorney," the record suffices to resolve the issue. We hold the trial court did not err by allowing this testimony.

[14] Defendant next contends the trial court erred by omitting, in its jury charge, one of the five essential elements of first-degree murder on the basis of malice, premeditation and deliberation. The State responds that the error was corrected prior to the beginning of jury deliberations and therefore defendant cannot show prejudice. We agree.

In its initial charge, the trial court overlooked three lines of the Pattern Jury Instructions and gave the definition of "deliberation" under the heading of "premeditation." At the conclusion of the charge, the court sent the jurors out to select a foreman, with specific instructions not to begin deliberations until the court sent in the verdict sheet. It then asked counsel for any requests for corrections to the charge, and counsel for defendant brought the error to the court's attention. Four minutes after the court sent the jurors out, it summoned them back to the courtroom and told them it had incorrectly instructed that the State must prove *four* things in order to convict for first-degree murder on the basis of malice, premeditation and deliberation; instead, the court said, the State must prove five things to convict. The court then instructed, correctly, on the five elements. Approximately two and one-half hours later, the jurors asked the court in writing to reinstruct them on the *five* elements of first-degree murder on the basis of malice, premeditation and deliberation: "What are the *five* points that the State has to prove for first-degree murder — premeditated, malice, deliberation?" The court thereupon recited the full charge on first-degree murder, tracking the North Carolina Pattern Jury Instructions. *See* N.C.P.I. — Crim. 206.10, at 4-6 (1989).

**STATE v. JENNINGS**

[333 N.C. 579 (1993)]

The initial instructions were clearly erroneous; the question is whether the subsequent instructions rendered the error harmless.

> Since a correct charge is a fundamental right of every accused, it must appear with reasonable certainty in any case — especially in one involving a capital offense — that the court's error . . . was corrected, its harmful effect entirely removed, and the correct rule clearly fixed in the minds of the jury in order for the conviction to stand.

*State v. Orr*, 260 N.C. 177, 181, 132 S.E.2d 334, 337 (1963). Here, the trial court immediately discovered its error, promptly and expressly retracted it, and recharged the jury on all five elements of first-degree murder, not just premeditation and deliberation. Further, the court subsequently restated all five elements when the jury requested clarification. Further still, the jurors requested that the court reinstruct on the *five* points and specifically mentioned premeditation and deliberation. It appears clear that the correct rule was fixed in the minds of the jurors. We are convinced that the prompt and complete correction of the erroneous instruction rendered that error harmless. *See id.* at 182, 132 S.E.2d at 338 ("Surely the trial court has power to correct an inadvertence, especially if the discovery is immediate and the correction prompt and complete."). This assignment of error is overruled.

[15] Defendant next argues that the trial court erred by giving the following "deadly weapon" instruction to the jury, over defendant's objection:

> [A] murder can occur with or without a deadly weapon. I instruct you that if the State proves beyond a reasonable doubt that the defendant killed the victim with a deadly weapon or intentionally inflicted a wound upon the deceased with a deadly weapon that proximately caused his death, you may infer: first, that the killing was unlawful, and second, that it was done with malice. But you are not required or compelled to make this inference, but you may if you find beyond a reasonable doubt that the murder occurred with a deadly weapon.

> A deadly weapon, ladies and gentlemen, is a weapon which is likely to cause death or serious injury. In determining whether any instrument involved was a deadly weapon, you should consider its nature, the manner in which it was used, the

size, the strength or the age difference of the defendant as compared to the victim.

Defendant contends there was insufficient evidence that a deadly weapon was used, and that this instruction was therefore inappropriate.

The State responds that its theory of the case was that defendant kicked or stomped Jennings in the abdomen while wearing her cowboy boots. Superior Court Judge Knox Jenkins testified that Jennings had told him defendant had threatened to stomp him to death with her cowboy boots. Paramedic Fowler testified that defendant was wearing a nightgown and cowboy boots when the emergency team arrived at the motel room. These boots were introduced into evidence; the jurors could observe the shape and hardness of each toe and sole. Dr. Hudson, the forensic pathologist who performed the autopsy, testified that Jennings died as a result of blood loss from the tear in the mesentery due to blunt force injury to the abdomen "consistent with a kick or a stomp." Dr. Hudson's testimony tied the boots to Jennings' death.

We have stated:

> An instrument . . . may be deadly or not, according to the mode of using it, or the subject on which it is used. For example, in a fight between men, the fist or foot would not, generally, be regarded as endangering life or limb. But it is manifest, that a wilful blow with the fist of a strong man, on the head of an infant, or the stamping on its chest, producing death, would import malice from the nature of the injury, likely to ensue.

*State v. West*, 51 N.C. 505, 509 (1859). *See also State v. Sturdivant*, 304 N.C. 293, 301, 283 S.E.2d 719, 725 (1981) ("any article, instrument or substance which is likely to produce death or great bodily harm" is a deadly weapon). Thus, cowboy boots, when worn to kick or stomp an elderly man, may be a deadly weapon. The evidence here was sufficient to support the "deadly weapon" instruction. This assignment of error is overruled.

In the guilt-innocence phase, we conclude that defendant received a fair trial, free from prejudicial error.

STATE v. JENNINGS

[333 N.C. 579 (1993)]

SENTENCING PHASE ISSUES

The trial court submitted three aggravating circumstances: that the murder was committed while the defendant was committing or attempting to commit a sex offense, N.C.G.S. § 15A-2000(e)(5) (1988) (phrased somewhat differently); that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6) (1988); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (1988). It submitted one statutory mitigating circumstance: that defendant had no record of criminal convictions, N.C.G.S. § 15A-2000(f)(1) (1988). It submitted twenty-one non-statutory mitigating circumstances, as follows: the defendant has been a peaceful person in the community in which she lived; the defendant has been a law-abiding citizen in the community in which she lived; the defendant is a recovering alcoholic; the defendant has successfully raised three children; the defendant is the grandmother of three grandchildren; the defendant's parents were victims of alcoholism; the defendant has endured a bilateral mastectomy requiring the removal of both her breasts; the defendant has been active in community volunteer organizations; the defendant has experienced the death of an infant daughter; the defendant saw the need to improve herself educationally; the defendant furthered her education by taking courses and being licensed as a cosmetologist, a licensed practical nurse, and a registered nurse; the defendant is currently a registered nurse who has worked at three hospitals; the defendant has useful work skills; the defendant has performed deeds of kindness during her lifetime; the defendant has held the leadership position of lead and charge nurse; the defendant suffered an automobile accident in 1973 and was in a cast; the defendant has no prior record for violent crimes; the defendant's childhood history, background and record show no indication of a habitually violent nature; the defendant has the support of her family; the defendant was gainfully employed as a nurse prior to her marriage to the decedent; and any other circumstance or circumstances arising from the evidence which the jury finds to have mitigating value.

[16] Defendant contends that the trial court committed plain error in submitting the aggravating circumstance that the murder was committed while defendant was engaged in the commission of or while attempting the penetration of the anus with an object, in that the court failed to allege the aggravating circumstance in the statutory language of N.C.G.S. § 15A-2000(e)(5); or the court omitted a necessary element of the crime of sexual offense on

the Issues and Recommendations form. Defendant contends that the court should have worded the aggravating circumstance using the statutory language in N.C.G.S. § 15A-2000(e)(5), or else should have added the phrase "by force and against the will of the deceased." Defendant concedes that the trial court properly instructed the jurors, orally, on the aggravating circumstance. She contends, notwithstanding, that the jurors may have followed the incorrect abbreviated written issues sheet, and found only that defendant had penetrated Jennings' anus with a blunt object, with his consent or without force, which act constitutes a crime against nature but not a sex offense.

Defendant failed to object to the wording of the written list and review is therefore limited to determining whether the omission constituted plain error. We discern no plain error.

N.C.G.S. § 15A-2000(e)(5) states, in pertinent part:

(e) Aggravating circumstances which may be considered shall be limited to the following:

. . . .

(5) The capital felony was committed while the defendant was engaged . . . in the commission of, or an attempt to commit . . . a sex offense.

N.C.G.S. § 15A-2000(e)(5). The trial court gave the jury the following instructions on the law on this aggravating circumstance:

The following are the aggravating circumstances which might be applicable to this case. All right, you may now refer to about middle way down the front page where it says, number one.

One, was this murder committed by the defendant—let me read it from the verdict sheet. "Was the murder committed while the defendant was engaged in the commission of or while attempting the penetration of the anus with an object?"

That is, was it committed while the defendant was committing or attempting to commit a sexual offense.

Now, ladies and gentlemen, a sexual offense involves the penetration of the victim's anus by force or by the threat of force and was sufficient to overcome any resistance which

the victim might make, and that the victim did not consent, and it was against his will.

If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim the defendant had committed or had attempted to commit a sexual act with the victim and that she did so by force or threat of force, and was sufficient to overcome any resistance which the victim might make, and that the victim did not consent and it was against his will, you would find this aggravating circumstance
. . . .

The trial court, however, furnished the jury with a written list that asked simply, "Was the murder committed while the defendant was engaged in the commission of or while attempting the penetration of the anus with an object?" Apparently, the trial court abstracted the statutory language of only the *sexual act* and not the *sexual offense* onto the written list. *See* N.C.G.S. § 14-27.5(a) (1986) ("A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person: (1) By force and against the will of the other person"); N.C.G.S. § 14-27.1(4) (1986) (A sexual act means "the penetration, however slight, by any object into the genital or anal opening of another person's body [except] for accepted medical purposes.").

Defendant notes, correctly, that we have never required that the trial court duplicate the exact statutory language of N.C.G.S. § 15A-2000(e) on the written list of Issues and Recommendations furnished the jury. N.C.G.S. § 15A-2000(b), in pertinent part, states that

the judge shall include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) which may be supported by the evidence, and shall furnish to the jury a written list of issues *relating to such aggravating or mitigating circumstance or circumstances.*

N.C.G.S. § 15A-2000(b) (1988) (emphasis added). Defendant contends that the oversight caused the jurors to follow the incorrect abbreviated law transcribed to the written list furnished them.

We are convinced, however, that the additional or alternative written instructions now suggested by defendant would have had

no probable effect on the jury's response to the issue, and thus that the incomplete written issues sheet did not constitute plain error. *See, e.g., Walker*, 316 N.C. at 39, 403 S.E.2d at 83 ("Before deciding that an error by the trial court amounts to 'plain error,' the appellate court must be convinced that absent the error the jury probably would have reached a different verdict."); N.C. R. App. P. 10(c)(4) (1993). Defendant conceded at oral argument that the trial court properly instructed the jury, orally, on the aggravating circumstance. Just prior to giving these instructions, the trial court gave each juror a copy of the written list of Issues and Recommendations and referred them to the location of the circumstance on the list. The court stated:

> To enable you to follow me more easily the bailiff will now give each of you a copy of this form . . . which you will take with you when you retire to deliberate. . . . [D]o not read ahead on this form, but simply refer to this form as I instruct you on the law.

The trial court then twice instructed the jury that to affirmatively answer the question on the form—at which they were looking—they must find that the defendant penetrated Jennings' anus "by force or threat of force, . . . sufficient to overcome any resistance which the victim might make, and that the victim did not consent and it was against his will." We are convinced that the trial court, augmenting thus the written instructions, fixed the correct law in the minds of the jurors. *Orr*, 260 N.C. at 181, 132 S.E.2d at 337 ("Since a correct charge is a fundamental right of every accused, it must appear with reasonable certainty in any case . . . that the court's error . . . was corrected, its harmful effect entirely removed, and the correct rule clearly fixed in the minds of the jury . . . ."). We presume "that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985).

The evidence tends to show that Jennings suffered multiple scrapes, cuts and bruises to his head, scalp, face, arms, hands, legs, chest, buttocks and genitalia, as well as to his anus, all in the day before his death. Dr. Hudson, the pathologist who performed the autopsy, opined that the splits in the thin membrane that lined the anus around Jennings' sphincter were caused by

STATE v. JENNINGS

[333 N.C. 579 (1993)]

insertion of a blunt object into the anus that stretched the surface of the membrane to the point it split. The splits were not caused by insertion of a rectal thermometer, or picking or scratching by fingernails, or constipation. Jennings, Dr. Hudson opined, would have suffered pain, notwithstanding the quantity of analgesic in his body.

Defendant did not attempt to establish that she penetrated Jennings' anus with his consent. Rather, her defense, presented by her own testimony and testimony of her experts, was innocence. Jennings, defendant testified, had been depressed and had remained in his motel room the day before his death; she had watched him and cared for him. However, she had found him in the bathroom beating himself with a shoe and a piece of old cheese. Jennings had also been constipated and had picked and scratched at his rectum, and had, in fact, bled profusely from his rectum the day of his death. Dr. Brown, a psychiatrist and an attorney, testified that it is not uncommon for demented patients to injure themselves. After viewing photographs of the injuries, he opined that the injuries could have been self-inflicted.

The evidence thus presented no issue as to defendant's use of force or the victim's lack of consent, but called for a determination as to the credibility of the State's witnesses versus that of defendant's witnesses. The jury's finding of the aggravating circumstance, even as worded on the written list of Issues and Recommendations, shows that it did not believe the defendant.

For these reasons, we hold that the trial court did not commit plain error in failing to furnish the jury with the additional or alternative written material that defense counsel did not request at trial.

Within this same assignment of error, defendant contends that the evidence did not support the existence of this aggravating circumstance. We conclude that the evidence set forth above, and reasonable inferences therefrom, support a finding that the defendant committed the murder while she was engaged in the commission of, or while attempting the penetration of, Jennings' anus with an object by force and against his will. *See generally State v. Syriani*, 333 N.C. 350, 392, 428 S.E.2d 118, 141 (1993) ("In determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled

to every reasonable inference to be drawn therefrom, and discrepancies and contradictions resolved in favor of the State."). This assignment of error is overruled.

[17] Defendant's next assignment of error involves the trial court's instructions on the pecuniary gain aggravating circumstance, N.C.G.S. § 15A-2000(e)(6). Defendant filed a written objection to the use of this aggravating circumstance, arguing, in part, that it was "unconstitutional[ly] vague and overbroad . . . as applied in this case."

The trial court instructed the jury as follows:

A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained, or intends or expects to obtain, money or some other thing which can be valued in money, either as compensation for having committed the crime, or as a result of the death of the victim.

If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, *the defendant stood to benefit from the remaining partnership accounts at the Merrill Lynch in the name of the decedent*, you would find this aggravating circumstance, and would so indicate by having your foreman write, "Yes", in the space after this aggravating circumstance on the form. If you do not so find or have reasonable doubt as to one or more of these things, you will not find this aggravating circumstance and will so indicate by having your foreman write, "No", in that space.

(Emphasis added). *See* N.C.P.I.—Crim. 150.10, at 14-15 (1992).

Defendant contends that the italicized language renders the aggravating circumstance constitutionally defective because it does not "narrow the class of murderers subject to capital punishment" in that incidental financial gain will accrue to the surviving spouse of virtually every marriage. *See Gregg v. Georgia*, 428 U.S. 153, 187 & 196, 49 L. Ed. 2d 859, 882 & 887-88 (1976) (the death penalty is an "extreme sanction, suitable to the most extreme of crimes"; a state can act to "narrow the class of murderers subject to capital punishment by specifying aggravating circumstances which must be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed."). The instruction, she argues, does not require that defendant kill the victim for the purpose of obtaining money; rather, it allows the jury to find the aggravating circumstance if defendant stood to gain financially by her husband's

death, even if this financial gain were merely incidental to his death.

Defendant claims, essentially, that the instruction is ambiguous and therefore subject to an erroneous interpretation. In reviewing such an instruction, we inquire " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. ---, ---, 116 L. Ed. 2d 385, 399 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 329 (1990)). To satisfy this "reasonable likelihood" standard, a defendant must show more than a "possibility" that the jury applied the instruction in an unconstitutional manner, but need not establish that the jury was "more likely than not" to have misapplied the instruction. *Boyde*, 494 U.S. at 380, 108 L. Ed. 2d at 329.

> [A] capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" jury could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* at 380-81, 108 L. Ed. 2d at 329.

The gravamen of the pecuniary gain aggravating circumstance is that "the killing was for the purpose of getting money or something of value." *State v. Gardner*, 311 N.C. 489, 513, 319 S.E.2d 591, 606 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985); *see also State v. Oliver*, 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981) ("[t]he hope of pecuniary gain provided the impetus for the murder"). This financial motivation or impetus "aggravates" the murder, distinguishing the murder from other murders as being more

egregious and therefore more worthy of the extreme sanction of death. Defendant contends that the underlined language of the second paragraph of the instructions, especially the phrase "stood to benefit," sweeps too broadly in that it directs the jury to find this aggravating circumstance on the mere fact that defendant would benefit financially from the death of her husband through his will leaving all his property to her. Some incidental financial gain, defendant notes, will accrue to the surviving spouse of virtually every marriage.

The State responds that when read in conjunction with the first paragraph, and in the context of the trial record, the instruction is not constitutionally infirm. *See Estelle v. McGuire,* 502 U.S. at - - -, 116 L. Ed. 2d at 399 (the instruction must be considered, not in "artificial isolation," but in the context of the instructions as a whole and the trial record) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 38 L. Ed. 2d 368, 373 (1973)); *see also State v. McNeil,* 327 N.C. 388, 392, 395 S.E.2d 106, 109 (1990) (single instruction "must be viewed in the context of the overall charge"), *cert. denied,* 499 U.S. - - -, 113 L. Ed. 2d 459 (1991). We agree.

"Stands," as in "stands to benefit," means "to be in a position to gain or lose *because of an action taken* or commitment made." *Webster's Third New International Dictionary* 2223 (1976) (emphasis added). The first paragraph of the instruction requires the jury to find that at the time *when defendant committed the murder,* she intended or expected to obtain money or something of value as a result:

A murder is committed for pecuniary gain if the defendant, *when he commits it,* has obtained, or *intends or expects to obtain,* money or some other thing which can be valued in money, either as compensation for having committed the crime, or *as a result of the death of the victim.*

(Emphasis added). We conclude that the language of the second paragraph, including the phrase "stood to benefit," viewed in the context of the instructions as a whole, is not unconstitutionally vague or overbroad.

There was, moreover, substantial evidence before the jury tending to show that the murder of the aged and vulnerable Jennings was committed for the purpose of pecuniary gain. Jennings, who was almost eighty years old at the time of his death, was thirty-three

years older than the defendant. Shortly after their marriage, defendant arranged for a sizeable portion of the victim's financial assets to be transferred to her own bank account. George Henry, the Merrill Lynch financial advisor working with the victim's money, testified that defendant exhibited a demeanor that showed "no compassion whatsoever for her husband." "Her face, her eyes, her tone, was something like I had never seen before in my life."

At the beginning of September 1987, Jennings' account with Merrill Lynch contained approximately $170,000. During that month, $20,000 was withdrawn from the account, with the checks written to defendant. In addition, certificates of deposit in the amounts of $2,000 and $1,000 were transferred to defendant around that time. Thus, by the time defendant and the victim met with Merrill Lynch advisor George Henry in September 1987, Jennings' assets amounted to only $150,000. As a result of that meeting, almost one-half of that amount was transferred to defendant's account. One month later, Jennings' account was depleted by approximately $17,000 for a car for defendant. Credit card charges for motel bills and other expenses further depleted Jennings' account. Defendant's account during this period was dormant.

Two months later, Jennings informed Henry that his wife had abandoned him with no money at a hotel and that he wished to cease transferring funds to her account. Shortly thereafter, the couple reconciled, and the defendant succeeded in having Jennings give her power of attorney. Two weeks later Jennings, with the assistance of an attorney, rescinded the power of attorney because defendant "was taking everything that he had." One year after their marriage, only $37,000 remained in Jennings' account with Merrill Lynch. At the time of his death, Jennings had only $21,000 in his account. Henry testified that he had received three letters purportedly signed by Jennings requesting that the remaining assets be transferred to defendant. The assets were not transferred because Merrill Lynch refused to transfer any more funds from Jennings to defendant. Defendant claimed that she did not have to kill Jennings because she had power of attorney and could have effected the transfer at any time before Jennings' death; she did not have to rely on the transfer of all his property to her under his will. However, Henry testified that Merrill Lynch had informed defendant that it would make transfers only if (1) Jennings wrote a letter requesting that the accounts be transferred to his new broker, or (2) Jennings completed a form requesting that the accounts, mostly

limited partnerships, be liquidated, or (3) their new broker wrote Merrill Lynch saying he would accept the accounts. Finally, many witnesses testified that Jennings frequently complained that defendant was draining him of money to the point of destitution and that she physically abused and intimidated him.

Within this same assignment of error, defendant contends that the evidence did not support the existence of this aggravating circumstance. We conclude that the evidence noted above, and reasonable inferences therefrom, support a finding that the defendant committed the murder for pecuniary gain. *Cf., e.g., State v. Barfield*, 298 N.C. 306, 311-12, 259 S.E.2d 510, 519-20 (1979) (record supported jury's finding that defendant poisoned her boyfriend for pecuniary gain where defendant was afraid he would turn her in for forging checks to his account in the amounts of $100, $300 and $95), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). This assignment of error is overruled.

[18]    Defendant next contends that the trial court erred by denying her request that it instruct the jury "you are entitled to base your verdict upon any sympathy or mercy you may have for the defendant that arises from the evidence presented in this case," thereby depriving her of rights under the Eighth and Fourteenth Amendments of the United States Constitution. We have recently addressed and rejected the same argument in *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 684, *reh'g denied*, --- U.S. ---, --- L. Ed. 2d ---, 61 U.S.L.W. 3714 (1993). We stated:

> We believe that trial courts should not refer to "sympathy." Instead, when instructing the jury to consider the statutory catch-all mitigating circumstance of *"[a]ny other circumstance arising from the evidence* which the jury deems to have mitigating value," trial courts should emphasize that the jury must weigh all mitigating considerations whatsoever which it finds supported by evidence. N.C.G.S. § 15A-2000(f)(9) (1988) (emphasis added). We believe that this course will lead the jury to consider all of the mitigating evidence introduced as required by *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), without the risk of encouraging the jury to exercise unbridled, and thus unconstitutional, discretion.

*Hill*, 331 N.C. at 421, 417 S.E.2d at 783.

Here, the trial court submitted the statutory catch-all mitigating circumstance, N.C.G.S. § 15A-2000(f)(9), with the instructions recommended in *Hill*; therefore, it did not err in this regard. For these reasons, this assignment of error is overruled.

[19] Defendant next contends that the trial court erroneously allowed evidence of the victim's good character introduced during the guilt phase to be considered at the penalty phase, thus violating the North Carolina capital punishment statute. Defendant concedes that the United States Supreme Court has foreclosed her argument that her Eighth Amendment rights were violated. *Payne v. Tennessee*, 501 U.S. ---, 115 L. Ed. 2d 720 (1991) (Eighth Amendment does not prohibit either admission of evidence of, or prosecutorial argument about, the murder victim's personal characteristics).

She argues, however, that during his argument in the penalty phase, the prosecutor improperly referenced evidence of the victim's character adduced at the guilt phase: "But then Bill Jennings' good name wasn't good enough for her either, was it? . . . [He was a] fine man, who [the defendant's] own son even testified was a fine man. . . . All of these things that have no basis whatsoever just to smear that good man's reputation." She argues further that the trial court improperly instructed the jury at the penalty phase that it could consider all evidence heard at both the guilt and penalty phases.

We have already concluded that the character evidence was admissible to rebut defendant's evidence that her victim was a mentally confused, demented man who often acted bizarrely. Pursuant to N.C.G.S. § 15A-2000(a)(3), that evidence is competent for consideration by the jury during the penalty phase, and therefore the prosecutor's references to that evidence during his penalty phase argument were not improper. *See, e.g., State v. McNeil*, 324 N.C. 33, 48, 375 S.E.2d 909, 918 (1989) (counsel are entitled to argue to the jury all the law and facts in evidence and all reasonable inferences that may be drawn therefrom, but may not place before the jury incompetent and prejudicial matters and may not travel outside the record by interjecting facts not included in evidence), *vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, 499 U.S. ---, 113 L. Ed. 2d 459 (1991). Further, the trial court's instruction that the jury could consider all evidence introduced

at both phases was appropriate under N.C.G.S. § 15A-2000(a)(3). *See, e.g., Syriani*, 333 N.C. at 396, 428 S.E.2d at 143. For these reasons, we hold that the court did not err in allowing evidence of the victim's good character introduced during the guilt phase to be considered at the penalty phase. This assignment of error is overruled.

[20] Defendant next contends that the trial court erred in submitting the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel," in that defendant was convicted of first-degree murder on the basis of torture, and we have interpreted our "especially heinous, atrocious, or cruel" aggravating circumstance as directed at "the conscienceless or pitiless crime which is *unnecessarily torturous* to the victim." *State v. Goodman*, 298 N.C. 1, 25, 257 S.E.2d 569, 585 (1979) (emphasis added). The State responds that the circumstance was properly considered in that defendant was convicted on the bases of both torture and premeditation and deliberation. We agree.

We have held that "when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit [the underlying felony] to the jury . . . [as one of] the aggravating circumstance[s]" enumerated in N.C.G.S. § 15A-2000(e)(5). *State v. Cherry*, 298 N.C. 86, 113, 257 S.E.2d 551, 568 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980). We concluded that "the possibility that a defendant convicted of a felony murder will be sentenced to death is disproportionately higher than the possibility that a defendant convicted of a premeditated killing will be sentenced to death due to the 'automatic' aggravating circumstance dealing with the underlying felony." *Id.* "[The] underlying felony may not be considered as an aggravating circumstance in the penalty phase, because it has merged with and become a part of the murder conviction as an essential element thereof." *State v. Silhan*, 302 N.C. 223, 263, 275 S.E.2d 450, 478 (1981). However, "when a jury specifies that it finds a defendant guilty upon both theories [*i.e.*, premeditation and deliberation and felony murder] and *both* are supported by the evidence, the underlying felony may properly be submitted as an aggravating circumstance." *Id.* at 262, 275 S.E.2d at 478.

The situation here is analogous. Assuming without deciding that it is error to submit the "especially heinous, atrocious, or cruel" aggravating circumstance when a defendant is convicted

of first-degree murder solely on the theory of torture, where, as here, the jury finds a defendant guilty upon the theories of both torture and premeditation and deliberation, and both are supported by the evidence, the aggravating circumstance may properly be submitted.

[21]   Within this assignment of error, defendant further contends that the trial court erred in submitting two aggravating circumstances based on the same evidence, *i.e.*, the penetration of Jennings' anus with a blunt object by force or against his will. The two aggravating circumstances were: (1) that the murder was committed during a sex offense, N.C.G.S. § 15A-2000(e)(5); and (2) the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). Defendant contends that the evidence of the sex offense was necessary to a finding that the murder was especially heinous, atrocious, or cruel. We disagree. There was substantial evidence of the especially heinous, atrocious, or cruel nature of the killing apart from the evidence as to whether the murder was committed "while attempting the penetration of the anus with an object."

The evidence tends to show that defendant savagely beat her elderly victim. He sustained multiple bruises and cuts to his head, scalp, face, neck, and legs; several bruises on his arms and hands suggested he tried to defend himself or ward off blows. Jennings endured bruises, scrapes and cuts to his penis — there was skin consistent with the type of skin found on the underside of the head of a penis on a forceps found in the motel room. Severe kicks or stomps to the abdomen tore the victim's mesentery, causing internal hemorrhaging. These blows did not cause immediate death. The quantity of mucus collected in his bronchial tubes showed that Jennings died slowly of multiple injuries. The blow to his head may have stunned him, and a large amount of analgesic in his bloodstream notwithstanding, the internal hemorrhaging would have caused him considerable pain, drowsiness, eventual unconsciousness and death. There was blood in the motel room, splattered on the furniture, ceiling, walls, floor, and back of the mirror. There was evidence that defendant had cleaned up blood in the bathroom. There was blood on the bedsheets and pillowcase and on towels in the bathtub.

This evidence and reasonable inferences therefrom, apart from the evidence of attempted penetration of the victim's anus, support

a finding that the killing was excessively brutal and physically agonizing, conscienceless, pitiless and unnecessarily torturous to the victim. *See, e.g., Syriani,* 333 N.C. at 392-93, 428 S.E.2d at 141 (evidence of twenty-eight stab wounds, all but one superficial, several defensive, and that the victim was conscious at least upon admission to hospital, sufficient to support "especially heinous, atrocious, or cruel"); *State v. Huffstetler,* 312 N.C. 92, 115-16, 322 S.E.2d 110, 124-25 (1984) (severity and brutality of numerous blows with cast iron skillet supported submission of aggravating circumstance, notwithstanding that there was no evidence as to whether the victim was alive or conscious during assault), *cert. denied,* 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). This case thus is distinguishable from *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979) and *State v. Quesinberry,* 319 N.C. 228, 354 S.E.2d 446 (1987), where this Court found a complete overlap of evidence supporting two aggravating circumstances. We therefore reject defendant's contention that it was error to submit both aggravating circumstances. While the trial court should have instructed the jury that it could not use the same evidence as the basis for finding both circumstances, defendant did not object to its failure to do so. We do not believe the failure to so instruct had a probable impact on the jury's finding of these circumstances; we thus decline to find plain error in the failure to so instruct. This assignment of error is overruled.

PRESERVATION ISSUES

[22-27] Defendant raises six additional issues which she concedes this Court has decided against her position: (1) the trial court erred by instructing jurors that premeditation, deliberation and intent to kill are not essential elements of first-degree murder on the basis of torture; (2) the Issue III instruction, directing the jury to continue to Issue IV if the mitigating circumstances are of equal value and weight to the aggravating circumstances, is unconstitutional; (3) the trial court erred by submitting the aggravating circumstance that the murder was especially heinous, atrocious or cruel, because that aggravating circumstance is unconstitutionally vague and overbroad as applied in North Carolina and in this case; (4) the North Carolina death penalty statute, and consequently the death sentence in this case, is unconstitutionally vague and overbroad, has been imposed in a discretionary and discriminatory manner, has been imposed or withheld on the basis of arbitrary and capricious factors and in individual cases without proper guidance; (5) the trial court erred in instructing the jury that the defendant

had the burden of proving mitigating circumstances by a preponderance of the evidence; and (6) the trial court erred in denying the defendant's motion for a bill of particulars from the State disclosing the statutory aggravating circumstances relied upon in seeking the death penalty.

We have considered defendant's arguments on these issues, and we find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[28] Having found no error in the guilt and sentencing phases, we are required by statute to review the record and determine (1) whether the record supports the jury's finding of the aggravating circumstances upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315 (1987), *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

We have held that the record supports the jury's finding of the three aggravating circumstances submitted to it: that the murder was committed while the defendant was engaged in the commission of or an attempt to commit a sex offense, N.C.G.S. § 15A-2000(e)(5); that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and that the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). We further conclude that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review and "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown*, 315 N.C. 40, 70, 337 S.E.2d 808, 829 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds*, *State v. Vandiver*, 321 N.C. 570, 354 S.E.2d 373 (1988). We compare this case to cases found to be free of error in both phases of the trial, *State v. Jackson*, 309 N.C. 26, 45, 305 S.E.2d 703, 717 (1983), in a pool consisting of

*all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). We consider only those cases "roughly similar with regard to the crime and the defendant . . . ." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*Id.*

This case involves the murder of a frail and elderly husband by his healthy and much younger wife of less than three years. Features distinguishing the case include that (1) the murder was preceded by a period of physical and verbal abuse, during which defendant depleted her husband's financial resources; (2) the final assault on her husband was prolonged — occurring over two days — and vicious; (3) the victim, her husband, suffered great physical pain before death; and (4) the defendant never exhibited any remorse for the crime or pity for her victim. The jury found three aggravating circumstances: that the murder was committed while the defendant was engaged in the commission of or while attempting the penetration of the anus with an object; that the murder was committed for pecuniary gain; and that the murder was "especially heinous, atrocious, or cruel." The jury found only one statutory mitigating circumstance, that defendant had no record of criminal convictions, and three non-statutory mitigating circumstances: that defendant had been a peaceful person in the community in which she lives; that she had no prior record for violent crimes; and

that her childhood history, background and record showed no indication of a habitually violent nature.

Defendant relies on six cases in which this Court has found the death penalty disproportionate. Two involved the "especially heinous, atrocious, or cruel" aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). Three were robbery-murders and involved the pecuniary gain aggravating circumstance. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). One involved the course of conduct aggravating circumstance. *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). None is similar to the present case.

In *Stokes*, the defendant and two others planned to rob the victim's warehouse. During the robbery one of the trio severely beat the victim about the head, killing him. *Stokes*, 319 N.C. at 3, 352 S.E.2d at 654. This Court adjudged it important that the defendant was only seventeen. There was evidence that he suffered from an impaired capacity to appreciate the criminality of his conduct and was under the influence of mental or emotional disturbance at the time of the murder. Further, this was a robbery-murder. The defendant was convicted on the theory of felony murder; there was virtually no evidence of premeditation and deliberation, and no evidence that the defendant was the ringleader or deserved a death sentence any more than an older confederate who received a life sentence. *Id.* at 21 & 24, 352 S.E.2d at 664 & 666. We find the manifest dissimilarities with the present case significant.

In *Bondurant*, the defendant pointed the gun at the victim, a traveling companion, taunted him for two or three minutes, and shot him. *Bondurant*, 309 N.C. at 677, 309 S.E.2d at 173. The Court "deem[ed] it important in amelioration of defendant's senseless act that immediately after he shot the victim, he exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. Defendant then entered the hospital to seek medical assistance for the victim. Further, the defendant spoke with police at the hospital, confessing that he fired the shot that killed the victim. *Id.* In the present case, by contrast, the defendant, a nurse by

training, made no effort to secure medical treatment for her victim, even though the hospital was directly across the street from the motel. There was evidence that her victim had been dead more than four hours before defendant telephoned for emergency medical assistance.

In *Benson,* the defendant accosted the victim and demanded his moneybag. The victim hesitated and defendant fired his shotgun, striking the victim in the upper portion of both legs; the victim died later in the hospital of cardiac arrest occasioned by loss of blood from the gunshot wounds. *Benson,* 323 N.C. at 321, 372 S.E.2d at 518. This Court found the death penalty disproportionate because the defendant was convicted solely on the theory of felony murder; the evidence that he fired at the victim's legs tended to show that he intended only to rob the victim. The jury found only the pecuniary gain aggravating circumstance, but found, as mitigating circumstances, that defendant was under the influence of mental or emotional disturbance, as well as, as in the present case, that defendant had no significant history of prior criminal activity. *Id.* at 328, 372 S.E.2d at 522. Further, the defendant confessed and cooperated upon arrest, voluntarily consented to a search of his motel room, car and home, and pleaded guilty during the trial and acknowledged his wrongdoing before the jury, *id.* at 328-29, 372 S.E.2d at 522-23, in contrast to the actions of the defendant in the present case.

The murders in *Young, Jackson* and *Rogers* are simply not characterized by the viciousness and cruelty of the murder in the present case.

There are four similar cases in the pool in which the jury recommended a sentence of death after finding as an aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." *Syriani,* 333 N.C. 350, 428 S.E.2d 118; *Huffstetler,* 312 N.C. 92, 322 S.E.2d 110; *Williams,* 308 N.C. 47, 301 S.E.2d 335; *State v. Smith,* 305 N.C. 691, 292 S.E.2d 264, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983).

In *Syriani,* the defendant accosted his estranged wife and stabbed her to death. Following the assault, the defendant walked calmly back to his van and drove to a nearby fire station, where he told a fireman he needed medical attention because he had

been in a fight. *Syriani*, 333 N.C. at 359 & 364, 428 S.E.2d at 121-22 & 124. The jury found as the single aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." The jury also found one statutory mitigating circumstance, that the crime was committed while the defendant was under the influence of mental or emotional disturbance. It found five non-statutory mitigating circumstances: that defendant understood the severity of his conduct; that he had, since his incarceration, demonstrated an ability to abide by lawful authority; that he had a history of good work habits; that he had a history of being a good family provider; and that he had been a person of good character or reputation in the community in which he lived. It found two circumstances under the catchall: that the defendant was raised in a different culture and that he was aggravated by events following the issuance of the *ex parte* domestic violence order. *Id.* at 401, 428 S.E.2d at 146. This Court concluded that the sentence of death was not disproportionate, based on evidence similar to that in the present case, including the prior threats and abuse, the brutal nature of the killing, the lack of remorse or pity shown by the defendant, and the defendant's cool actions after the murder. *Id.* at 401-06, 428 S.E.2d at 146-49.

In *Huffstetler*, the defendant beat his mother-in-law to death with a cast iron skillet. He fractured her jaw, neck, spine and collarbone. After the beating, the defendant went home to change his bloody clothes, returned to the scene to remove the skillet, and left to spend the night with a woman friend. *Huffstetler*, 312 N.C. at 98-100, 322 S.E.2d at 115-16. The jury in *Huffstetler* found as the single aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." The jury also found three mitigating circumstances: that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; that the killing occurred contemporaneously with an argument and by means of an instrument acquired at the scene and not taken there; and that the defendant did not have a history of violent conduct. *Id.* at 100, 322 S.E.2d at 116. This Court found the sentence of death not disproportionate, emphasizing the exceptionally brutal, prolonged and unprovoked nature of the assault and the defendant's cool actions afterwards. *Id.* at 118, 322 S.E.2d at 126.

In *Smith*, the defendant kidnapped and raped a cheerleader, then beat her to death and threw her body in a pond. *Smith*,

305 N.C. at 693-96, 292 S.E.2d at 266-68. The jury found as aggravating circumstances that the murder was committed while the defendant was engaged in the commission of rape, robbery and kidnapping, and that the murder was "especially heinous, atrocious, or cruel." The jury found as a mitigating circumstance that the defendant was under the influence of mental or emotional disturbance. *Id.* at 707-08, 292 S.E.2d at 274-75. This Court upheld the sentence of death.

In *Williams*, the defendant battered an elderly woman and sexually assaulted her with a mop handle, leaving her to die. *Williams*, 308 N.C. at 51-54, 301 S.E.2d at 339-40. The jury found four aggravating circumstances: that the murder was committed while the defendant was engaged in the commission of first-degree burglary; that the murder was committed while he was engaged in a sexual offense; that the murder was committed for pecuniary gain; and that the murder was "especially heinous, atrocious, or cruel." The jury found no mitigating circumstances. *Id.* at 57-58, 301 S.E.2d at 342. In upholding the sentence of death, this Court emphasized that the assault had been vicious and prolonged and that the victim was defenseless. *Id.* at 82, 301 S.E.2d at 357.

Defendant also relies on one case as being similar to the present case, *State v. Allen*, 322 N.C. 176, 367 S.E.2d 626 (1988), in which the jury recommended a life sentence. In *Allen*, the defendant was convicted of the first-degree murder of her infant son. She admitted that she poured alcohol on the infant's feet and legs as he slept in his crib and then set fire to the crib. She watched the fire burn for about a minute and then left her apartment, taking her older daughter to a neighbor's where she stayed for thirty minutes. She said she wanted to kill her child and had been thinking about burning the child for days. She had tried to smother her daughter with a pillow some years earlier. *Id.* at 181, 367 S.E.2d at 628-29. There was evidence, however, that defendant was mildly retarded and suffered from paranoid schizophrenia. The court-appointed psychiatrist testified that, at the time of the fire, defendant lacked the capability of knowing the nature and quality of her behavior. *Id.* at 182, 367 S.E.2d at 629. These dissimilarities are significant and distinguish this case from the present case.

There are four cases of murder by a spouse in which the jury recommended a life sentence: *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574 (1982); *State v. Hinson*, 310 N.C. 245, 311 S.E.2d

256, *cert. denied*, 469 U.S. 839, 83 L. Ed. 2d 78 (1984); *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980); *State v. Colvin*, 297 N.C. 691, 256 S.E.2d 689 (1979). None are similar to the present case. In each of these marital killings, the killings were by gunshot and there was not the evidence of excessive brutality or suffering that there is in the present case. In *Woods*, the defendant hired her lover to kill her husband and was present when he shot her husband as he walked out the front door to go to work. The defendant was convicted as an accessory before the fact. *Woods*, 307 N.C. at 215-16, 297 S.E.2d at 576. In *Hinson*, the defendant and her lover, who pretended to be a law enforcement officer in an unmarked car, pulled the husband over; the defendant's lover shot her husband. *Hinson*, 310 N.C. at 247-49, 311 S.E.2d at 259. In *Myers*, there was evidence that the defendant had physically and verbally abused his wife and had threatened to kill her. *Myers*, 299 N.C. at 674-76, 263 S.E.2d at 770-72. On the day of the killing, the defendant confronted his wife and forced her to drive while he held a gun to her head. The victim grabbed the gun and pointed it away, but the defendant regained control of the gun and fired, killing her. *Id.* at 678, 263 S.E.2d at 773. In *Colvin*, the defendant said he would kill his wife before he would allow her to take his children away. He got a rifle, pointed it at his wife, and pulled the trigger, killing her. *Colvin*, 297 N.C. at 692, 256 S.E.2d at 690.

There are two cases of murder perpetrated by means of torture in which the jury recommended a life sentence. *State v. Crawford*, 329 N.C. 466, 406 S.E.2d 579 (1991); *State v. Phillips*, 328 N.C. 1, 399 S.E.2d 293, *cert. denied*, --- U.S. ---, 115 L. Ed. 2d 977 (1991).

In *Crawford*, the defendant coerced his girlfriend's six-year-old son to drink large quantities of water. *Crawford*, 329 N.C. at 470, 406 S.E.2d at 581. The swelling of the brain resulting from the ingestion of water caused a tremendous headache, culminating in a scream and followed by blindness; the fluid filling the child's lungs would have created a sensation of suffocation. *Id.* at 482, 406 S.E.2d at 588. The defendant maintained that the killing was accidental and that he was disciplining the child for disobeying house rules, or that he was administering a home remedy for food poisoning. *Id.* at 470-71, 406 S.E.2d at 581. The jury, as in the present case, found defendant guilty of first-degree murder based on both premeditation and deliberation, and torture. However, the

jury declined to find the only submitted aggravating circumstance, that the murder was "especially heinous, atrocious, or cruel." *Id.* at 475, 406 S.E.2d at 584.

In *Phillips*, the defendants, husband and wife, battered a foster daughter to death. *Phillips*, 328 N.C. at 7-9, 399 S.E.2d at 295-96. The record shows that the jury found the two submitted aggravating circumstances, that the murder was "especially heinous, atrocious, or cruel," and that the murder was part of a course of conduct including the commission of other crimes of violence against other persons. The jury also found both defendants guilty of felony child abuse of another foster child. It found the statutory mitigating circumstance, for both defendants, that the defendant had no significant history of prior criminal activity. It found ten non-statutory mitigating circumstances for each defendant, as well as the catchall, including the circumstances that defendants had been good parents and foster parents prior to the offenses charged and that they made efforts to revive the victim and save her life.

In the present case, by contrast, the defendant systematically abused her frail and elderly husband; she gave him drugs that confused him, and had, on at least one occasion, beaten him, dragged him across the room and stomped him with her cowboy boots. Jennings had told several friends he was afraid defendant would kill him or have him committed to an institution. Defendant waited five to ten hours before she reported the death and requested emergency medical personnel, but when they arrived, she was performing CPR on Jennings, who was, by that time, cold and stiff.

These circumstances distinguish this case from the cases discussed above. We find that *Syriani, Huffstetler, Williams* and *Smith* are the cases in the pool most comparable to this case. The extent of the brutality involved here, as in those cases, precludes our concluding that the death sentence in this case was excessive or disproportionate, considering both the crime and the defendant.

We hold that the defendant received a fair trial and sentencing hearing, free of prejudicial error. In comparing this case to similar cases in which the death penalty was imposed, and in considering both the crime and the defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. *Robbins*, 319 N.C. at 529, 356 S.E.2d at 317.

NO ERROR.

## STATE v. JENNINGS

[333 N.C. 579 (1993)]

Justice PARKER did not participate in the consideration or decision of this case.

Justice FRYE concurring in guilt-innocence phase and dissenting in sentencing phase.

I agree with the majority that, in the guilt-innocence phase of her trial, defendant received a fair trial, free from prejudicial error. Accordingly, I vote to uphold the jury's verdict finding defendant guilty of the first-degree murder of her husband. I cannot agree, however, with the majority's conclusion that defendant's capital sentencing proceeding was free of prejudicial error. Accordingly, I vote for a new capital sentencing proceeding. In the penalty phase of the trial, three aggravating circumstances were submitted to the jury. As they appeared on the verdict sheet,[1] the aggravating circumstances were: (1) Was the murder committed while the defendant was engaged in the commission of or while attempting the penetration of the anus with an object? (2) Was the murder committed for pecuniary gain? and (3) Was the murder especially heinous, atrocious or cruel? The jury answered "yes" to each aggravating circumstance.

The jury found four mitigating circumstances: (1) Defendant has no record of criminal convictions;[2] (2) Defendant has been a peaceful person in the community in which she lives; (3) Defendant has no prior record for violent crimes; and (4) Defendant's childhood history, background and record show no indication of a habitually violent nature. After weighing the aggravating circumstances against the mitigating circumstances, the jury concluded that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty.

---

1. The verdict sheet is the piece of paper jurors take with them to the jury room. Printed on the verdict sheet are the issues which the jurors must decide. In the sentencing phase of a capital trial, jurors write "yes" or "no" beside each issue. For example, in this case, jurors wrote "yes" after the question: "Was the murder committed while the defendant was engaged in the commission of or while attempting the penetration of the anus with an object?"

2. Although submitted to the jury as a statutory mitigating circumstance (N.C.G.S. § 15A-2000(f)(1) (1988)), the submitted circumstance is nonstatutory since it relates to *convictions* while the statute relates to "no significant history of prior criminal activity."

The jury recommended, and the trial court imposed, a sentence of death.

Defendant argues that each of twelve alleged errors in the penalty phase of her trial entitles her to a new capital sentencing proceeding. I need not decide whether any one error, standing alone, warrants a new sentencing proceeding. As Justice Meyer said for a unanimous Court in a recent case involving trial error:

> Although neither of the trial court's errors, when considered in isolation, might have been sufficiently prejudicial to warrant a new trial, we are of the opinion that cumulatively they are sufficiently prejudicial that we are unable to say that defendant received a fair trial, and therefore a new trial is required.

*State v. White*, 331 N.C. 604, 610-11, 419 S.E.2d 557, 561 (1992). Likewise, I conclude that cumulative errors in the sentencing phase of defendant's capital trial were sufficiently prejudicial to require a new capital sentencing proceeding.

I first consider defendant's assignment of error as it relates to the trial judge's instructions for the pecuniary gain aggravating circumstance, N.C.G.S. § 15A-2000(e)(6) (1988). Defendant filed a written objection to the use of this aggravating circumstance, arguing, in part, that it was "unconstitutional[ly] vague and overbroad . . . as applied in this case."

Nevertheless, the trial judge instructed the jury as follows:

> A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained, or intends or expects to obtain, money or some other thing which can be valued in money, either as compensation for having committed the crime, or as a result of the death of the victim.
>
> If you find from the evidence beyond a reasonable doubt that **when the defendant killed the victim, the defendant stood to benefit from the remaining partnership accounts at the Merrill-Lynch in the name of the decedent, you would find this aggravating circumstance, and would so indicate by having your foreman write, 'Yes,' in the space after this aggravating circumstance on the form.** If you do not so find or have a reasonable doubt as to one or more of these things, you will

not find this aggravating circumstance and will so indicate by having your foreman write, 'No,' in that space.

*See* N.C.P.I.—Crim. 150.10 (1990).

Defendant argues that the underlined portion of the instruction is constitutionally defective because it does not require that defendant kill the victim *for the purpose* of obtaining money. The instruction allows the jury to find this aggravating circumstance if defendant stood to gain financially by her husband's death, even if this financial gain were merely incidental to his death, defendant argues. The State argues that this instruction is not constitutionally defective and should be upheld. I agree with defendant.

In reviewing the constitutionality of jury instructions in a capital case, the critical question is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, --- U.S. ---, ---, 116 L. Ed. 2d 385, 399 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 329 (1990)). To satisfy this "reasonable likelihood" standard, a defendant must show more than a "possibility" that the jury applied the instruction in an unconstitutional manner, but a defendant need not establish that the jury was "more likely than not" to have misapplied the instruction. *See Boyde*, 494 U.S. at 380, 108 L. Ed. 2d at 329.

The gravamen of the pecuniary gain aggravating circumstance is that "the killing was *for the purpose* of getting money or something of value." *State v. Gardner*, 311 N.C. 489, 513, 319 S.E.2d 591, 606 (1984) (emphasis added); *State v. Oliver*, 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981). It is this financial motivation which "aggravates" the murder, that is, which sets this type of murder apart from other murders as being more egregious and therefore more worthy of the ultimate penalty of death. Certainly, as implicitly recognized by the State, the underlined portion of the instructions sweeps too far in that it directs the jury to find this aggravating circumstance on the mere fact that defendant "stood to benefit" financially from the death of her husband. As noted by defendant at oral argument, the surviving spouse of virtually every marriage will have some incidental financial gain from the death of his or her spouse. The contested language ignores the essence of the pecuniary gain aggravating circumstance: that the defendant killed the victim *for the purpose* of financial gain.

The State argues, however, that when read in conjunction with the first paragraph, the instruction in this case is not constitutionally defective. I disagree. The first paragraph of the instruction states:

A murder is committed for pecuniary gain if the defendant, when he commits it, **has obtained, or intends or expects to obtain, money** or some other thing which can be valued in money, **either** as compensation for having committed the crime, **or as a result of the death of the victim**.

(Emphases added.)

In this case, the State argues, the pecuniary gain aggravating circumstance was properly submitted to the jury because there was evidence from which the jury could find that this killing *was motivated*, at least in part, by defendant's desire to collect the remaining $21,000 in her husband's Merrill Lynch account. The majority notes that there was substantial evidence tending to show that the murder was committed for the purpose of pecuniary gain. I view the question—not as one of sufficiency of the evidence to support the aggravating circumstance—but whether, given the conflicting evidence, the jury was properly instructed on the law to be applied in reaching its decision. There was no evidence that defendant was "compensated" for the death of her husband, as in a killing-for-hire situation; nor was there evidence that defendant actually took money or other things of value from the person or presence of her dead husband, as in an armed robbery situation. Thus, jurors were asked to decide under this first paragraph whether defendant intended or *expected* to receive money as a result of her husband's death. When read in conjunction with the second paragraph, I conclude there is a "reasonable likelihood" that the jury applied this instruction in an unconstitutional manner, that is, in a manner which allowed it to find this aggravating circumstance without regard to whether defendant killed the victim *for the purpose* of obtaining the money. The pecuniary gain instructions were therefore unconstitutionally vague and overbroad as applied in this case.

In another assignment of error, defendant argues that the first aggravating circumstance as it appeared on the verdict sheet— "Was the murder committed while the defendant was engaged in the commission of or while attempting the penetration of the

anus with an object?"—was improperly submitted to the jury because it is not one of the eleven aggravating circumstances enumerated in N.C.G.S. § 15A-2000(e). I agree.

Before turning to the merits of this argument, I note that the State argued in its brief and at oral argument that defendant did not object to the submission of this aggravating circumstance at trial and therefore has not preserved her right to appellate review on this issue. *See* N.C. R. App. P. 10(b). The State is correct that defendant made no objection at trial. Because this error is so fundamental to the proper functioning of our capital sentencing scheme, however, we should address it as though defendant objected at trial. *See* N.C. R. App. P. 2; *see also State v. Fowler*, 270 N.C. 468, 472, 155 S.E.2d 83, 86 (1967) (when considering a capital case, this Court may review "any errors that appear in the record, whether excepted to and assigned or not").

The only aggravating circumstances upon which the State may rely when seeking the death penalty are those enumerated in N.C.G.S. § 15A-2000(e). N.C.G.S. § 15A-2000(e) (1988). ("Aggravating circumstances which may be considered *shall be limited to the following* . . . .") (emphasis added); *State v. Taylor*, 304 N.C. 249, 257, 283 S.E.2d 761, 768 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983). The aggravating circumstance at issue here, as it appeared on the verdict sheet, is not among the eleven enumerated in N.C.G.S. § 15A-2000(e). Therefore, submission of this aggravating circumstance as a basis for the death penalty was error.

Judging from the *oral instructions*, it is obvious that the trial judge was relying on N.C.G.S. § 15A-2000(e)(5), which reads, in pertinent part:

> (5) The capital felony was committed while the defendant was engaged . . . in the commission of, or an attempt to commit . . . a sex offense.

The crime of sexual offense is divided into first-degree and second-degree sexual offense. *See* N.C.G.S. §§ 14-27.4 -.5. Again, judging from the oral instructions, it is clear that the trial judge was relying on N.C.G.S. § 14-27.5(a)(1), second-degree sexual offense, which reads, in pertinent part:

(a) A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person:

(1) By force and against the will of the other person . . . .

"Sexual act" is defined in N.C.G.S. § 14-27.1(4), in pertinent part, as "penetration, however slight, by any object into the genital or anal opening of another person's body."

In his oral instructions to the jury, Judge Butterfield correctly explained this aggravating circumstance as follows:

Now, ladies and gentlemen, a sexual offense involves the penetration of the victim's anus by force or by threat of force and was sufficient to overcome any resistance which the victim might make, and that the victim did not consent, and it was against his will.

The aggravating circumstance, as it appears on the verdict sheet, however, does not require the penetration of the victim's anus be by force or against the victim's will; instead, only penetration is required. What appears on the verdict sheet as an aggravating circumstance does not constitute the crime of sexual offense, and is therefore not one of the eleven exclusive aggravating circumstances set out in N.C.G.S. § 15A-2000(e). Although sexual offense was correctly defined during oral instructions, we have no way of knowing whether jurors based their decision on what they heard from the judge, or instead, whether they based their decision on the erroneous, nonstatutory aggravating circumstance appearing on the verdict sheet.

In another assignment of error, defendant argues that the trial court erred by submitting both of the following aggravating circumstances: (1) the capital felony was committed during a sex offense, N.C.G.S. § 15A-2000(e)(5) (1988); and (2) the capital felony was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (1988). Defendant argues that it was error to submit both of these aggravating circumstances because the evidence of the sex offense was included in the evidence of especially heinous, atrocious, or cruel. Although I disagree with defendant that it was error to submit both of these aggravating circumstances, I believe that the trial judge erred by failing to instruct the jury that it could not use the same evidence to find both aggravating circumstances.

STATE v. JENNINGS

[333 N.C. 579 (1993)]

It is improper for the trial court to submit two aggravating circumstances supported by the same evidence. *State v. Quesinberry,* 319 N.C. 228, 239, 354 S.E.2d 446, 453 (1987) (murder committed for pecuniary gain and murder committed while defendant engaged in commission of a robbery); *State v. Goodman,* 298 N.C. 1, 29, 257 S.E.2d 569, 587 (1979) (murder committed to disrupt or hinder lawful exercise of governmental function or enforcement of laws and murder committed for purpose of avoiding or preventing lawful arrest or effecting escape from custody). The submission of two aggravating circumstances based on the same evidence is improper because it "amount[s] to an unnecessary duplication of the circumstances enumerated in the statute, resulting in an automatic cumulation of aggravating circumstances against the defendant." *Goodman,* 298 N.C. at 29, 257 S.E.2d at 587.

I find this case distinguishable from *Quesinberry* and *Goodman.* Unlike those cases, there was not a complete overlap of evidence between the two aggravating circumstances in this case. Furthermore, I agree with the State that there was evidence *other than the sexual offense* which would have supported the proper submission of the aggravating circumstance of especially heinous, atrocious, or cruel. I therefore reject defendant's argument that it was error to submit both of these aggravating circumstances.

However, I agree with defendant that there is a reasonable likelihood that a jury would find the sexual offense alleged, the forced penetration of the anus with an object against the will of the deceased, to be also especially heinous, atrocious, or cruel. This would result in the "cumulation of aggravating circumstances against the defendant." *Id.* To avoid this cumulation, the trial court, at a new sentencing proceeding, should instruct the jury in such a way as to ensure that jurors will not use the same evidence to find both aggravating circumstances.

I recognize that, judged in light of the State's evidence, this was a particularly brutal and senseless murder. However, whenever the State seeks to impose society's ultimate punishment, it is the responsibility and duty of this Court to ensure that a defendant, no matter how horrific the crime, is afforded a fair sentencing proceeding in accord with our capital sentencing procedures as set forth in N.C.G.S. § 15A-2000. Given the three errors outlined above, errors touching upon each of the three aggravating circumstances found by the jury as a basis for recommending a sen-

tence of death, I cannot say that defendant received such a fair proceeding. Accordingly, while upholding the jury verdict of guilty of the crime charged, I would vacate defendant's death sentence and remand this case to Superior Court, Wilson County, for a new capital sentencing proceeding consistent with N.C.G.S. § 15A-2000.

Chief Justice EXUM joins in this concurring and dissenting opinion.